**Brian CORDERO, a minor, by his mother, Irish BATES, et al., Plaintiffs,**

v.

**PENNSYLVANIA DEPARTMENT OF EDUCATION and the Commonwealth of Pennsylvania, Defendants.**

**Civ. A. No. 1:CV–91–0791.**

United States District Court, M.D. Pennsylvania.

June 23, 1992.

Leonard Rieser, Christina Aborlleile, Educ. Law Center PA, Philadelphia, Pa., for plaintiffs.

John G. Knorr, III, Ernest D. Preate, Jr., Atty. Gen. of Pa., Gregory R. Neuhauser, Office of Atty. Gen., Harrisburg, Pa., for defendants.

Michael I. Levin, Abington, Pa., Stuart L. Knade, Cleckner & Fearen, Harrisburg, Pa., for amicus, Pennsylvania School Boards Ass'n.

Leo A. Hackett, Fronefield and Defuria, Media, Pa., for movant, Chester Upland School Dist.

## MEMORANDUM

RAMBO, District Judge.

Before the court is the motion for summary judgment of the plaintiff class. This motion has been fully briefed, including an amicus curiae brief filed by the Pennsylvania Association of School Districts, and is therefore ripe for disposition.

### Background

This action challenges the Commonwealth of Pennsylvania's system for educating its disabled children. As presently configured, Pennsylvania's special education system involves the use of both public and private schools. Generally, public school placement for disabled children—special classes within "mainstream" schools, for instance—is favored. If a child's needs cannot be addressed in that setting, however, the child's school district may, at the Commonwealth's expense, place the child in one of a number of private schools approved by the Commonwealth. However, the undisputed reality of the situation is that access to the private schools is limited. Most of the approved facilities are located on the western or eastern borders of the state, and even in those institutions the number of available spots is relatively few. The Commonwealth does not provide funding for private placements in schools not approved by the Pennsylvania Department of Education ("PDE"), the agency charged with overseeing public education in the Commonwealth.

The net result of this state of affairs is that disabled children whose districts lack the means to provide them appropriate special education are saddled with delays of months, and in some cases years, while they wait for the districts in which they live to find a suitable private school for them.

In response, several disabled children and their parents brought suit against the Commonwealth and the Department of Education pursuant to 20 U.S.C. § 1415(e) of the Individuals with Disabilities Education Act ("IDEA"), which empowers individuals to bring private actions to ensure that handicapped children receive "free appro-priate public educations." The original Plaintiffs also launched a claim pursuant to § 504 of the Rehabilitation Act, 29 U.S.C. § 794, which authorizes the disabled to bring suit against governmental entities for unequal distribution of services. Plaintiffs contend that the design of the Commonwealth and PDE's "approved private school system" coupled with the failure to implement workable alternate programs causes many disabled children in the Commonwealth to wait unreasonable lengths of time to secure appropriate education. The action seeks declaratory and injunctive relief.

On September 6, 1991, this court issued a memorandum and order creating a class of plaintiffs in this action. The class consists of

> [a]ll Pennsylvania children with disabilities whose school districts have determined that they cannot currently be appropriately educated in a public educational setting and who have been waiting for more than thirty days for the provision of an appropriate educational placement; and all Pennsylvania children who may in the future meet these criteria.

Order of Court (September 6, 1991).

The plaintiff class has now moved for summary judgment on the liability portion of their claims. If judgment with regard to liability were granted, Plaintiffs ask that the court fashion remedial relief addressing the following concerns: (1) the placement in appropriate educational environments of disabled children known to be currently awaiting placements; (2) the creation of methods for identifying on a continuing basis all other children experiencing delays in placement and of plans to insert them in appropriate settings; (3) the creation of methods for determining what elements of education are missing from those offered by the state and the implementation of plans to enlarge the number of placement options so that children may be placed appropriately and without delay (as envisioned by Plaintiffs, this process would utilize the resources of the state Department of Public Welfare as well as the Depart-

ment of Education); and (4) the creation and implementation of plans for compensatory educational services for the plaintiff class.

*Discussion*

The standards for the award of summary judgment under Federal Rule of Civil Procedure 56 are well known. As the Third Circuit Court of Appeals recently capsulized:

> Summary judgment may be entered if "the pleadings, deposition[s], answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Equimark Comm. Finance Co. v. C.I.T. Financial Serv. Corp.*, 812 F.2d 141, 144 (3d Cir.1987). If evidence is "merely colorable" or "not significantly probative" summary judgment may be granted. *Anderson*, 106 S.Ct. at 2511; *Equimark*, 812 F.2d at 144. Where the record, taken as a whole, could not "lead a rational trier of fact to find for the nonmoving party, summary judgment is proper." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

*Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir.1987). Once the moving party has shown that there is an absence of evidence to support the claims of the nonmoving party, the nonmoving party may not simply sit back and rest on the allegations in his complaint, but instead must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,'

designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The court will consider Plaintiffs' motion under these standards.

## I. THE IDEA AND A "FREE APPROPRIATE PUBLIC EDUCATION"[1]

The IDEA is the latest incarnation of the Education of the Handicapped Act ("EHA"), which provides federal funding to states and to local educational agencies (e.g., school districts) so that they may provide a range of educational services to disabled children.[2] In exchange for the federal dollars, however, the Act imposes on the states a number of requirements. First and foremost among them is the mandate that every handicapped student be given a "free appropriate public education." 20 U.S.C. § 1412(1). This education must be provided "regardless of the severity of [the student's] handicap." *Id.* § 1412(2)(C).

The IDEA incorporates a definition of free appropriate public education:

> [S]pecial education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, ... and (D) are provided in conformity with the individualized education program required under section [1414(a)(5) of this title].

*Id.* § 1401(a)(18).

States are required under the IDEA to put in place various procedures to ensure that the child is receiving a free appropriate public education, and that if he is not, avenues are available to redress any problems. *See id.* § 1415(b), (e); *Board of Educ. v. Rowley*, 458 U.S. 176, 182–83, 102 S.Ct. 3034, 3038–39, 73 L.Ed.2d 690 (1982).

The principal means of carrying out the dictates of the IDEA is the Individualized

---

**1.** The court interprets Plaintiffs' IDEA and Rehabilitation Act claims as being alternative to one another. As the court believes that Plaintiffs may obtain their requested relief without disposition of the Rehabilitation Act claim, the court will refrain from addressing the issues brought out by that claim in this memorandum.

**2.** The Act's name was changed via § 901(a) of the Education of the Handicapped Act Amendments of 1990, P.L. 101–476.

Education Program ("IEP"), where the available educational and other options and services are shaped to fit the needs of each individual handicapped child. *Id.* § 1401(a)(16); *Honig v. Doe,* 484 U.S. 305, 311, 108 S.Ct. 592, 597, 98 L.Ed.2d 686 (1988). An IEP is made up of a detailed written plan of action created by a team of specialists (including educators, psychologists, physicians, and various therapists) which summarizes the student's abilities, sets goals for his progress, and forecasts what type of services the child may need. 20 U.S.C. §§ 1401(a)(19); 1414(a)(5). The local education agencies must review and, if necessary, revise the IEP on an annual basis at minimum. *Id.* §§ 1414(a)(5); 1413(a)(11).

The IDEA places the responsibility for the development and implementation of policies and procedures to guarantee disabled children a free appropriate public education on the states. *Id.* § 1412(1)–(2).

While the state has a central function in the educational scheme envisioned by the IDEA, school districts and parents are to be the front line providers of care and education. *Smith v. Robinson,* 468 U.S. 992, 1011, 104 S.Ct. 3457, 3468, 82 L.Ed.2d 746 (1984); *Rowley,* 458 U.S. at 208–09, 102 S.Ct. at 3052. Like the state, school districts are charged with providing a free, appropriate public education to the disabled children within their borders. 20 U.S.C. § 1414(a)(1). In Pennsylvania, the individual districts are instructed to provide and maintain special education services, and a complex web of statutes and regulations have been put in place by the legislature and the State Board of Education to carry out this mandate. Pa.Stat.Ann. tit. 24, § 13–1372(3) (1992 Supp.); *see also* 22 Pa.

Code §§ 14.1–14.74; §§ 342.1–342.74. The General Assembly has provided various formulae for the disbursement of funds to the districts. 24 Pa.Stat.Ann. § 25–2509 (1992 Supp.).

## II. DOES PENNSYLVANIA'S SYSTEM, AS OPERATED, DENY THE PLAINTIFF CLASS A "FREE APPROPRIATE EDUCATION?" [3]

Plaintiffs have launched what amounts to a four prong attack against Pennsylvania's system for educating disabled children and the responsible agencies' actions (or inactions) in ensuring that the children receive a free appropriate public education. According to Plaintiffs, Defendants' system: (1) does not tailor educational placements to the individual child's needs; (2) does not make available a continuum of education options so that a range of placement settings are available and one may be chosen which will most benefit the child; (3) results in many children being placed in environments more restrictive than necessary (that is, that children who do not necessarily require such services are being placed at home or in residential settings where they will have little contact with other children); and (4) fails to identify and correct violations of the protected children's rights.

Defendants essentially argue in return that any delays and violations of the IDEA suffered by class members are attributable to the actions of the individual districts, and that Pennsylvania has done all that is required by the IDEA.

The court will in this section first summarize Plaintiffs' four arguments, then discuss the merits of those arguments together with Defendants' counterarguments.

---

**3.** At this point the court would like to note that Defendants have not submitted a counterstatement of undisputed facts as required by Middle District Rule of Court 401.4. Under that rule, if such a statement is not submitted, the undisputed facts as set forth by the moving party are deemed unopposed. Accordingly, the court will assume that Defendants have no quarrel with the affidavits of parents and school district offi-

cials submitted by Plaintiffs. In addition, given this lack of opposition, the court sees little prejudice to Defendants in considering the additional affidavits of parents which Defendants contend in their brief were not turned over to them in discovery. Their testaments appear to echo those which had been turned over earlier, affidavits Defendants do not appear to have object-

### A. The Four Prongs [4]

#### 1. Have Defendants Failed to Ensure that Class Members Have Access to Appropriate Placements?

Plaintiffs point out that the IDEA requires that individual attention be paid to each student, and that each student is to be placed in an educational environment tailored to his needs. *Polk v. Central Susquehanna Intermediate Unit*, 853 F.2d 171, 172–73 (3d Cir.1988), *cert. denied sub nom, Central Columbia School Dist. v. Polk*, 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989); *see* 20 U.S.C. §§ 1412(4), 1414(a)(5); 34 C.F.R. §§ 300.-340–347 (regarding IEPs). Pennsylvania has delegated to individual school districts the front line responsibility of developing individualized plans and goals for the handicapped students. 22 Pa.Code §§ 14.2(d), 14.41.

In the present case, the plaintiff class consists of children who have been waiting to be placed in a private school for longer than 30 days. Plaintiffs state that PDE officials have admitted that on a statewide basis, the typical process of locating a private school placement takes in excess of 60 to 80 days, and sometimes may take six months or longer. Plaintiffs' Statement of Undisputed Facts at ¶ 32(a) (hereinafter Plaintiffs' UDF). In areas outside the urban western and eastern ends of the state, long waits for private placement are typical. For instance, in the Blast Intermediate Unit ("IU") No. 17, serving Bradford, Lycoming, Sullivan and Tioga Counties, the average wait from the referral date to actual placement in a private school is between three and six months. Plaintiffs' UDF at ¶ 32(g). In the Central IU, which ministers to Clearfield, Clinton and Centre Counties, the average wait for the six children who have been placed over the past three years has been two to three months, while seven other children who qualified for private placement were not admitted to the recommended schools. *Id.* at ¶ 32(i). The necessary inference to be drawn from these facts is that, while in this holding pattern, the children remain in placements which have been adjudged unsuitable or simply remain at home.

The numerous affidavits of parents and guardians of disabled children from around the state submitted by Plaintiffs bear this inference out. The affidavits are replete with discussions of individual children who have remained in homebound instruction or in classes already determined to be inappropriate while they waited for long periods of time until a suitable private school assignment was found. *Id.* at ¶¶ S6, 21–27, 33.

One example is provided by Irish Bates, a named plaintiff acting on behalf of her son, Brian Cordero. Ms. Bates states in her affidavit that Brian is seriously emotionally disturbed. Between 1989 and 1990, Brian was assigned to several public-related placements which turned out to be inappropriate because of his disruptive behavior. School officials had recommended a private placement, but the boy's application had been rejected by one school. Meanwhile, by the fall of 1990, Brian's behavior had been deteriorating, forcing Ms. Bates to seek help from her local county youth agency. She gave up temporary custody of the boy, and he was eventually placed in a home in Scranton. Ms. Bates, a resident of Delaware County, near Philadelphia, was billed $560.00 for the cost of Brian's program in December 1991. It is Ms. Bates' assessment that Brian's condition deteriorated in the eight months while Brian's school district attempted to locate a suitable private school for him.

---

ed. Therefore, there appears to be little chance of unfair surprise present here.

**4.** Defendants in their brief cite the standard of review of administrative decisions enunciated in *Board of Education v. Rowley* as being applicable here. That standard, which asks whether the state has complied with the Act's procedures and whether a child's IEP is reasonably calculated to confer educational benefits, *Rowley*, 458 U.S. at 206–07, 102 S.Ct. at 3051, is not relevant in the present action. This suit involves not an individual determination about the efficacy of an IEP as applied to one child, but instead challenges the structures of the system itself and the Commonwealth's actions within that system. Accordingly, the court will look to the requirements of the statute as interpreted by other courts and then analyze whether this system is adequate for the statute's purposes.

Plaintiffs argue that the cases like Brian Cordero's discussed in the affidavits on file show that handicapped children within Pennsylvania are being deprived of their overarching right under the IDEA—the right to an appropriate educational placement. These effects, they contend, are the result of systemic deficiencies at the state level, stemming not only from the limited network of approved private schools, but also from the lack of alternative publicly run services.

2. Does Defendants' System Fail to Provide a Sufficient Continuum of Placements Under the IDEA?

Plaintiffs next look to regulations enacted pursuant to the IDEA as establishing that states must make available a "continuum of alternative placements" to guarantee handicapped children access to an appropriately tailored education. 34 C.F.R. § 300.551 states:

(a) Each public agency shall insure that a continuum of alternative placements is available to meet the needs of handicapped children for special education and related services.

(b) The continuum required under paragraph (a) of this section must:

(1) Include the alternative placements listed in the definition of special education under [34 C.F.R. § 300.13] (instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions), and

(2) Make provision for supplementary services (such as resource room or itinerant instruction) to be provided in conjunction with regular class placement.

Then next section requires that

Each public agency shall insure that: ...

(b) The various alternative placements included under [§ 300.551] are available to the extent necessary to implement the individualized education program for each handicapped child.

*Id.* § 300.552. As with the other sections of the IDEA, the establishment of this continuum is the responsibility of the state. 20 U.S.C. § 1412(6) ("The State educational agency shall be responsible for assuring that the requirements of this part are carried out...."); 34 C.F.R. § 300.550(a); *Eva N. v. Brock,* 741 F.Supp. 626, 637 (E.D.Ky. 1990), *aff'd without op.* 943 F.2d 51 (3d Cir.1991) (reported in full at 1991 WL 164324, 1991 U.S.App. LEXIS 20,120) ("Maintaining a 'continuum of educational placements' as required by 34 C.F.R. § 300.551(a) is a responsibility of the state as a whole.").

Here, as discussed in subsection A of this memorandum, the undisputed facts show that private school placement options, a mainstay of the PDE's system of educating the disabled children, are limited. On a statewide basis, handicapped children who have been deemed eligible for private school placement wait significant periods of time before they are placed, and some are not placed at all. Many of the children referred for private school placements are turned down for admission again and again. In addition, local public school classes are often not adequate to meet the demand, particularly in the less populated areas of the state and particularly with regard to the most profoundly disabled of the children. Plaintiffs' UDF at ¶ 18. Some of these children are referred for private school placement only because of the dearth of publicly-operated classes, that is, because there is no place else to put them. *Id.* at ¶¶ 19–20; ¶ 68.[5]

The facts submitted by Plaintiffs indicate that Defendants have been and are aware of the problems that the restricted spectrum of options (outside of private school placement) has created and that indeed the PDE informed a local IU official that it

---

**5.** In a number of instances, local education authorities have notified the PDE of the demand for additional public special education classes to meet the needs of children who would otherwise be referred to private schools. In 1991, the Chester, Berks, and Lehigh–Carbon IUs all sent proposals for additional classes to the PDE

which would benefit the most severely disabled of the children in their areas, children which would otherwise be candidates for private school placement. Plaintiffs' UDF at ¶ 68(a), (b), and (c). Most of these proposals were turned down by the PDE. *Id.* at ¶ 69.

would conduct a "needs assessment ... to assess the continuum of services that exist" in four IUs covering 15 counties, but failed to follow up this commitment with action. Plaintiffs' UDF at ¶¶ 38, 61, 64–67.

Plaintiffs argue that Defendants' overemphasis on private school placements, and under emphasis on publicly-run programs and facilities constitutes an inadequate continuum of services. The result of this state of affairs, they conclude, is that students often find themselves placed in an over-restrictive environment, e.g., an unnecessary private school placement, or in a totally inappropriate setting, e.g., home or a mainstream classroom.

Plaintiffs argue that the facts suggest certain measures which may be used to remedy these problems regarding the available spectrum of treatments for handicapped children. Such measures would include helping needy districts to develop new publicly-operated services and instructing local districts that they may, if appropriate, place children in facilities and programs other than approved private schools.

### 3. Does Defendants' System Fail to Place Students in the "Least Restrictive Environment?"

■ The IDEA provides that a state must:

assure that, to the maximum extent appropriate, children with disabilities ... are educated with children who are not disabled, and that special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(5)(B); *see also* 34 C.F.R. § 300.550(b). As Plaintiffs point out, the section denotes a clear preference by Congress for the inclusion of handicapped children in classes with other children. *Garrick B. v. Curwensville Area School Dist.,*

669 F.Supp. 705, 711 (M.D.Pa.1987) ("[There is] a clear congressional preference for 'mainstreaming' of handicapped students"); *Greer v. Rome City School Dist.,* 950 F.2d 688, 695 (11th Cir.1991), *withdrawn on jurisdictional grounds,* 956 F.2d 1025 (11th Cir.1991) ("Only when the handicapped child's education may not be achieved satisfactorily even with one or more of these supplemental aids and services, may the school board consider placing the child outside the regular classroom.").

Under the IDEA, states are required not only to make available a continuum of options (as explained in the previous subsection of this memorandum), but also to give priority to education options which are less restrictive. *Garrick B.,* 669 F.Supp. at 711. Pennsylvania has put this policy in regulation form at 22 Pa.Code § 14.42. *Id.*[6] Section 14.42 states (as paraphrased):

(c) The IEP team shall recommend placement of the student in the regular educational environment of the regular public school which the student would attend if not exceptional [i.e., disabled], unless the IEP team determines that the IEP cannot be implemented in that placement even with supplemental aids and services.

(d) If the IEP team determines that placement of the student cannot be implemented within the regular educational environment, the IEP team shall review the alternative placements in subsection (e) *in descending order* and recommend the *first alternative setting* in which the IEP can be implemented. [Emphasis added.]

Subsection (e) creates a hierarchy of placement options (paraphrased for the sake of brevity):

(1) Regular classroom instruction for the entire school day with instructional support.

(2) Regular classroom instruction for all or most of the school day, with supplemental aids and services.

---

**6.** Apparently, § 14.42 is the successor regulation to § 13.11, which was repealed. The *Garrick B.* decision refers to § 13.11, which appears, at least for the purposes of this memorandum, to be substantially the same as its successor.

(3) Special education services and programs outside the regular class for most or all of the school day, with some mainstreaming.

(4) Special education services and programs outside regular school, including:

(i) Services and programs provided in a school district or intermediate unit special education center, with opportunities for mainstreaming as appropriate.

(ii) Services and programs provided in an approved private school, with opportunities for mainstreaming as appropriate.

(iii) Services and programs provided in a residential school or facility.

(iv) An approved out-of-state program.

(v) Instruction in the home.

See *Garrick B.,* 669 F.Supp. at 711.

Accordingly, it appears that even under Pennsylvania's statutes and regulations, residential or out of state schools and homebound instruction are generally not to be invoked as placement options unless less restrictive settings such as day programs or public school mainstreaming are not appropriate. Homebound instruction, which necessarily deprives children of contact with their peers, is intended for children whose medical or other condition makes it impossible to interact outside the home. Homebound instruction is, as Pennsylvania's Secretary of Education acknowledged, "not intended as an education placement available when school districts do not know what else to do." Plaintiffs' UDF at ¶ 25.

As discussed in several sections of this opinion, many children are being placed in either residential private facilities or in homebound instruction because alternative placements either do not exist or are not available. *Id.* ¶¶ 28–30, 22–27. In addition, some districts assign children to private schools in situations where the child could function in a public school setting with the proper support services. *Id.* ¶¶ 19, 41. Plaintiffs argue that this situation, as it continues, is violative of the least restrictive setting requirement of the Act, argue Plaintiffs.

### 4. Does Defendants' System Fail to Identify and Correct Violations of Plaintiffs' Rights?

Last, Plaintiffs charge that Defendants have failed to fulfill their duty to ensure that a placement system is developed which provides for adequate educational services to handicapped children in the Commonwealth and that that system is operating in an effective manner.

█ The IDEA requires that a state *"assure* that ... a practical method is developed and implemented to determine which children ... are not currently receiving needed special education and related services." 20 U.S.C. § 1412(2)(C) (emphasis added); *see also* 34 C.F.R. § 300.128(a)(2). A state must, moreover, ensure through oversight that state and local agencies, including school districts, fulfill the dictates of the Act. 20 U.S.C. § 1412(6); *see also* 34 C.F.R. § 300.600. The Department of Education is further required, so that some weight is given to its oversight function, to adopt enforcement procedures "including sanctions." 34 C.F.R. § 300.575. If local districts are failing to fulfill their mandates under the IDEA and state law, the state is required to step in and provide such assistance directly. 20 U.S.C. § 1414(d); *see also Muth v. Central Bucks School Dist.,* 839 F.2d 113, 129 (3d Cir.1988), *rev'd on other grounds,* 491 U.S. 223, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989) (if children are not receiving appropriate education, "the state agency is required to provide that education by contract or otherwise."); *Kruelle v. New Castle County School Dist.,* 642 F.2d 687, 696–97 (3d Cir.1981); *Battle v. Pennsylvania,* 629 F.2d 269, 278 (3d Cir.1980); *Hendricks v. Gilhool,* 709 F.Supp. 1362, 1367–69 (E.D.Pa.1989); *Wilson v. McDonald,* No. 85–506, slip. op. (E.D.Ky. May 15, 1987), *reprinted in* 1987–88 Education for the Handicapped Law Rep. 558; 364 (July 31, 1987).

Plaintiffs contend that although Defendants have been aware of the problems described throughout this memorandum, they have done little to intervene to correct the situation. This, Plaintiffs contend, rises to the level of a violation of the states'

supervisory function as envisioned by the statute.

The court notes that the focus of the administrative complaint due process procedures described *supra* at § I of this memorandum address complaints where there is a disagreement between officials and parents as to the appropriate placement of an individual child. This appears to constitute, with a few small exceptions, the length and breadth of Defendants' scheme of information gathering and correcting errors in placement.[7] As designed, however, the Pennsylvania system does not address the situation where there is agreement but no placements are available or where a medium-restrictive option such as publicly-operated classes would be even more appropriate but are not available. Moreover, there is no mechanism in existence for collecting and analyzing data on a state-wide basis in order to ascertain and rectify broad placement problems. There is no system in place which would ascertain the specifics of placement problems, e.g., the number, location and identities of children suffering from delays in finding adequate educational placements or the reasons behind the delays. Importantly, Plaintiffs point out that the state does not require districts to notify the PDE when they have children experiencing long placement delays, nor does the PDE itself survey the districts to obtain a portrait of placements. Plaintiffs' UDF at ¶¶ 37–60; *see* 20 U.S.C. § 1412(2)(C) (state is to implement practices to "determine which children are currently receiving needed special education and related services and which children are not currently receiving needed special education and related services").

### 5. The Merits Discussed

■ Interestingly, Defendants do not argue in their response that the state of affairs described by Plaintiffs are not violative of the IDEA; instead, they address only their perceived responsibility under the statute. Defendants do acknowledge that there "is no dispute that there can be difficulties and delays in locating appropriate placements." Defendants' Response Brief at 7. Defendants point out, however, that local school districts are the entities which are primarily responsible for administering and maintaining the availability of special education services under the Pennsylvania scheme. Pa.Stat.Ann. tit. 24, §§ 13–1372(3)—(4) (1992 Supp.). Defendants characterize the Commonwealth's duties under the IDEA essentially as providing funds, promulgating regulations and reviewing individual complaints. *See* 20 U.S.C. § 1412. Defendants further argue that the Commonwealth has carried these functions out, and is, therefore, in compliance with the Act. Procedures are available to process parental complaints regarding undue delays in placement, assistance to districts in locating placements is at the ready, and direction and training are given to the districts. Deposition Transcript of Dr. James Tucker, Director of PDE Bureau of Special Education, at F9–11, F18–19, F27, F33 (Jan. 6, 1992) (hereinafter Tucker Deposition); Deposition Transcript of John J. Tommasini, Director, Division of Administration, Bureau of Special Education, at G11–12, G14–15, G23–25, G34–36 (Nov. 13, 1991) (hereinafter Tommasini Deposition). Local school districts are empowered to use available funds in creative ways to ensure that handicapped students are receiving an appropriate education. 24 Pa.Stat.Ann. § 25–2509.1 (1992 Supp.); Tucker Deposition at F34–37; Tommasini Deposition at G18–19, G39–40.

The court does not agree with Defendants' assessment of their level of responsibility under the statute or their characterization of the suitability of the state's system of special education as presently configured. In the court's view, Plaintiffs

---

7. In September 1991, PDE established a monitoring procedure which currently is in place in only five school districts in the Commonwealth. In each of the target districts, 30 disabled students (or one percent of the total number of students with disabilities) are monitored. If a student within the sample group has a problem with placement, it is detected and addressed by the monitors. Students outside the sample group, however, are forced to attack a placement or recommendation themselves by filing an administrative complaint. Plaintiffs' UDF at ¶¶ 48–53.

have established that Pennsylvania's system of special education clearly violates the dictates of the IDEA. .

■ As defined by the IDEA, the state's role amounts to more than creating and publishing some procedures and then waiting for the phone to ring. The IDEA imposes on the state an overarching responsibility to ensure that the rights created by the statute are protected, regardless of the actions of local school districts. *Honig v. Doe,* 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988); *Kruelle v. New Castle County School Dist.,* 642 F.2d 687, 696–97 (3d Cir. 1981); *Lester H. v. Gilhool,* C.A. No. 86–6852, slip op., 1989 WL 136303 (E.D.Pa. Nov. 9, 1989), *aff'd,* 916 F.2d 865 (3d Cir. 1990), *cert. denied,* — U.S. —, 111 S.Ct. 1317, 113 L.Ed.2d 250 (1991); *Hendricks v. Gilhool,* 709 F.Supp. 1362, 1367–69 (E.D.Pa.1989). The state must assure that in fact the requirements of the IDEA are being fulfilled. 20 U.S.C. § 1412(6); 34 C.F.R. § 300.600.

Accordingly, with regard to the state's liability in this action, the fact that local agencies are not performing up to par or that parents are not fulfilling their duties becomes irrelevant. It is the state's obligation to ensure that the systems it put in place are running properly and that if they are not, to correct them. This is the crux of the state's liability in this matter.

There does not appear to be any dispute that numerous handicapped children in the Commonwealth are not receiving free appropriate public educations. The record here reveals that significant numbers of handicapped children are made to wait inordinate amounts of time to obtain placements in private schools which may not even be appropriate for them and which may cause the separation of families when it is not necessary. The record also shows that some parents are forced to release custody of their children so that they may obtain appropriate educational services through county welfare agencies, and even

then the families may be forced to pay for part of these services. It is not difficult for this court to conclude that many of these problems stem from the lack of available special educational alternatives in many local school districts around the state. The problem is exacerbated by a lack of centralized supervision by the PDE. Given the breadth of the problem described in subsections II.A.1—4 and PDE's want of response, the court is of the opinion that Defendants have stumbled with regard to the supervisory responsibility imposed by the IDEA. As written and applied, the Commonwealth's present procedures provide only for the passive reception of information in individual situations regarding individual disagreements as to treatments and services. The Commonwealth, additionally, has apparently been well aware of these ongoing problems but has taken only slight corrective action. As noted in subsection II.A.4 of this memorandum, the dereliction of this supervisory duty constitutes a violation of the Act in and of itself.

This state of affairs is not without cost: During their extended waiting periods, many parents who filed affidavits reported that their handicapped children had regressed and that their behavior had begun to deteriorate.[8]

Defendants assert that the individual problems here may be resolved through the procedures already established. The court agrees with Plaintiffs on this issue, however. By definition the class of plaintiffs here are young people who have already been found to require a type of placement currently not available and thus have remained in limbo for a period of time over a month. The court is convinced that the roots of this state of affairs may be traced to the design of the system itself: the absence of procedures for identifying geographic areas within the state which are lacking an adequate continuum of placement options; the failure to investigate and encourage wider development of publicly-operated classes; the lack of monitoring to

---

**8.** Defendants also argue that the individual cases invoked here are the hard ones—those involving children with the most severe handicaps whose education is problematic to begin with. Plaintiffs rightly point out in their reply brief, however, that the IDEA expressly give priority to children with the serious disabilities. 20 U.S.C. § 1412(3).

address situations where an individual or groups of individuals have been waiting excessive periods for an appropriate placement; and the lack of coordination between the state's Department of Education and Department of Welfare all contribute to the problem. The delays, moreover, are recurring and continuous, and may not be rectified through the existing hearings process.[9] *See Lester H. v. Gilhool,* No. 86-6852, slip op. at 23, 1989 WL 136303 (E.D.Pa. Nov. 9, 1989).

■ The violation of even one child's rights under the Act is sufficient to visit liability on the state. This is a proposition that has been reiterated time and again. *See, e.g., Honig; Kruelle,* 642 F.2d at 696-97; *Lester H.; Todd D. v. Andrews,* 933 F.2d 1576, 1582-83 (11th Cir.1991), *reh'g denied,* 943 F.2d 1316 (1991); *Miener v. Missouri,* 800 F.2d 749, 752-53 (8th Cir. 1986).

Here, however, there is evidence of numerous and continuing instances of children being denied their guarantee of a free appropriate public education. Given this circumstance, this court is well within its powers to declare that the Defendants' special education system as well as its supervision and leadership under the act are inadequate and to order injunctive relief to fix the problems. In *Battle v. Pennsylvania,* 629 F.2d 269 (3d Cir.1980), the Third Circuit considered whether Pennsylvania's policy of limiting special education to no more than 180 days per year transgressed the predecessor act to the IDEA. The court found that:

> the inflexibility of the defendants' policy of refusing to provide more than 180 days of education [is] incompatible with the Act's emphasis on the individual.... [T]he 180 day rule imposes with rigid certainty a program restriction which may be wholly inappropriate to the

child's educational objectives. This, the Act will not permit.

*Battle,* 629 F.2d at 280. The *Battle* court therefore found a portion of the state's system to be lacking, invalidated it, and sent the case back to the district court to fashion a form of relief which would accommodate the concerns of the class and the Commonwealth. Similarly, in the present case the system designed and implemented by Defendants severely restricts the availability of adequate placements and results in children being slotted for long periods of time in inappropriate and potentially harmful settings. The system as presented here is, like the 180 day requirement in *Battle,* rigid and unresponsive and needs to be reworked.

Other courts, when faced with systemic or state-wide violations of the IDEA have ordered injunctive relief against states. *See Muth v. Central Bucks School Dist.,* 839 F.2d 113, 120-26 (3d Cir.1988) (holding that Pennsylvania's statutory procedures were unconstitutional under the EHA); *Hendricks v. Gilhool,* 709 F.Supp. 1362, 1373 (E.D.Pa.1989) (failure to open necessary classes for special education of plaintiff class members was declared violative of the EHA and remedial steps were ordered); *Larry P. v. Riles,* 793 F.2d 969, 979-81 (9th Cir.1984) (state practice of using non-validated IQ tests to place students in classes for the mentally retarded was violative of the Act; injunctive relief ordered); *Parks v. Pavkovic,* 753 F.2d 1397, 1404-06 (7th Cir.1985), *cert. denied,* 474 U.S. 918, 106 S.Ct. 246, 88 L.Ed.2d 255 (1985) (state held responsible for regulation which required parents to pay portion of residential education expenses of handicapped children); *Jose P. v. Ambach,* 669 F.2d 865, 870-71 (2d Cir.1982) (plaintiff class granted injunctive relief to reform state education system where state had

---

**9.** One of the affidavits submitted by plaintiff is that of Ferne Blumenfeld. Ms. Blumenfeld sought and received an administrative hearing and secured an order that her daughter, Tara, be placed in either an IU program or a private school. Despite the existence of the administrative order, Tara spent over five months—the spring semester of the 1990–91 school year—

either at home or in public high school (a setting, because of her severe learning and emotional disabilities, had been determined to be inappropriate). Especially during the period when she was in homebound instruction, Tara became depressed and her condition generally deteriorated.

concededly failed to comply with EHA requirements).

Accordingly, this court finds that the pervasive problems in Pennsylvania's special education system violate the dictates of the IDEA; that these problems are a result of the system as it has been set up by Defendants and due to a lack of centralized supervision and leadership by Defendants; and that injunctive relief is necessary to bring the system into compliance with the Act.

### 6. Remedy

■ Defendants contend that the type of injunctive relief sought by Plaintiffs is too broad, and is thus not "appropriate" as envisioned by the IDEA at 20 U.S.C. § 1415(e)(2). Defendants characterize the relief requested as mandating the "replacement" of the Commonwealth's special education system.

The court is aware of the Supreme Court's admonishment in *Board of Education v. Rowley* that courts "must be careful to avoid imposing their view of preferable educational methods upon the States." *Rowley*, 458 U.S. at 207–08, 102 S.Ct. at 3051. The court believes that Defendants overstate the extent of the relief requested, however. The types of procedures and programs identified by Plaintiffs as those which may potentially solve the problems discussed in this memorandum may require some hard work and commitment, but will certainly not call for the dismantling of the existing system nor will it result in the abolition of local districts' responsibility. The scope of any remedy will of course be constrained by the realities of available funding. The court has "broad discretion" to fashion equitable relief under the Act, *School Comm. v. Department of Educ.*, 471 U.S. 359, 369, 105 S.Ct. 1996, 2002, 85 L.Ed.2d 385 (1985), the remedies identified by Plaintiffs would appear to provide a solid framework to build on, though, and the court has no doubt though that the parties, working together under the supervision of the court, can forge creative solutions to the problems identified.

An appropriate order will be issued.