**Jack Jr., Jean, and Jack III STRAUBE, Plaintiffs,**

v.

**FLORIDA UNION FREE SCHOOL DISTRICT, Thomas Sobol, Thomas Neveldine, Commissioners, New York State Education Department, Defendants.**

No. 91 Civ. 1359 (GLG).

United States District Court, S.D. New York.

Aug. 25, 1992.

and of full participation in the political process" should be available to all children equally. *San Antonio School District v. Rodriguez,* 411 U.S. 1, 37, 93 S.Ct. 1278, 1299, 36 L.Ed.2d 16 (1973). The Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* ("IDEA") (previously the Education for Handicapped Act ("EHA")[1]), was passed by Congress to ensure educational services for the handicapped who, prior to the passage of the Act, were in many cases not receiving any education at all.

The case of Jacob Straube is sad, but perhaps not that unusual. Jack, as he is known, is almost eighteen years old and about to enter his senior year in high school. Although he possesses average to above average intelligence, just prior to entering tenth grade, Jack read only at a third grade level. This suit is based on the claim that the educational system has failed this boy. Underlying is the ultimate question—what should our educational system be doing for students with handicaps?

Cole, Schotz, Bernstein, Meisel & Forman, P.A. by Rebecca K. Spar, of counsel, Hackensack, N.J., for plaintiffs.

Serchuk & Zelermyer by Steven A. Coploff, of counsel, New York City, for defendant Florida Union Free School Dist.

Robert Abrams, Atty. Gen. by Martha O. Shoemaker, of counsel, New York City, for defendants Thomas Sobol and Thomas Neveldine.

## OPINION

GOETTEL, District Judge.

Education plays a vital role in a free society. While not a fundamental right under the Constitution, our courts have consistently recognized that the opportunity to "acquire the minimal skills necessary for the enjoyment of the rights of speech

## BACKGROUND

Jack Straube has dyslexia which is a developmental disorder which affects his ability to read and write. This dyslexia is compounded by a condition known as attention deficit disorder, manifested by impulsivity and poor concentration. Jack has been classified as "learning disabled", as a result of these conditions, and is entitled, because of the IDEA, to receive, at public expense, specially designed instruction to meet his educational needs.

Jack is being educated in the Florida Union Free School District in Orange County, New York. He currently attends S.S. Seward Institute, the district's high school. The Florida school district is a small system serving roughly 400 students in total. Starting in third grade, Jack was evaluated annually by the district's Committee on

**1.** The EHA was passed in 1975 to address the right of children with disabilities to receive an education. Despite the amendments passed in 1990 and the change of the Act's name to the IDEA, the EHA remains the foundation for IDEA. *See Heldman v. Sobol,* 962 F.2d 148 n. 1

(2d Cir.1992). Thus, though this case was brought under the IDEA, the cases which have addressed the rights of disabled children under the EHA remain precedent for interpretations of the IDEA.

Special Education ("CSE") and provided with an Individualized Education Program ("IEP") which was intended to address his needs as identified by the CSE. Over the years, the programs set up for Jack by the CSE included time in a special resource room, mainstreaming into regular classes, remedial reading, and counseling. Despite these efforts, in 1990–91 when Jack would have entered tenth grade, test scores showed he read only at a third grade level. The IEP for that school year was similar to that of previous years. Jack's parents decided that the school district had had enough time to teach their son to read and challenged his IEP as "inappropriate". Their goal was to place Jack in the Kildonan School in Armenia, New York, a residential school which purportedly has a high degree of success in teaching dyslexic children to read. The Kildonan School utilizes a teaching method known as Orton–Gillingham which is a multi-sensory approach to learning.

Under the IDEA, parents are provided with due process in order to challenge an IEP which they believe is "inappropriate". The Straubes requested such a hearing to review the IEP proposed for Jack's sophomore year in high school. Shortly after the hearing commenced in August 1990, the school district agreed to place Jack at Kildonan. The Straubes began the enrollment process but were then told that the district could not authorize the Kildonan placement because the school was not "approved" by the New York State Education Department. The Straubes nevertheless enrolled Jack at Kildonan after allegedly investigating other alternatives drawn from the "approved" list.

The impartial hearing, at which the Straubes were represented by a trained lay advocate, took place over several days. At the conclusion, the Impartial Hearing Officer ("IHO") concluded that the "programs provided over the years, as resulted in this 15 year old's reading at a third grade level, must be considered a failure." *In the Matter of the Special Education Due Process*

*Hearing on the Petition of J.S.,* Impartial Hearing Officer's Decision (November 27, 1990), at 6. He determined that the school district's proposed placement as described in the 1990–91 IEP was inappropriate. The IHO noted, however, that Jack could not be placed in Kildonan, although that school appeared to present the best hope because of its particular teaching methods, because the school was not approved by the State Education Department, a requirement under the IDEA. The IHO observed that "no private school either within or without the state dealing with this Child's severe learning disability, at his chronological age, is registered as an approved school." *Id.,* at 8. The IHO remanded the case back to the CSE to reformulate Jack's IEP for the 1990–91 school year. The Straubes began this suit to challenge the IHO ruling and placed Jack in Kildonan.

After nine months in Kildonan, Jack's reading scores had improved dramatically.[2] Lacking the funds to continue his education there, the Straubes re-enrolled Jack in the Florida high school. The IEP fashioned for 1991–92 continued the same educational strategy as the other ones that had failed so miserably in the past: mainstreaming for all subjects but math and reading, special education reading, five hours per week in the resource room and counseling. The IEP noted that Jack required a multi-sensory approach to learning.

## DISCUSSION

The Straubes, the Florida school district and the State are all moving for summary judgment. The Straubes seek conditional approval of Kildonan, compensatory damages and an order to the State to institute new procedures for the approval of schools. The State and the school district seek dismissal of the Straubes' complaint in its entirety. Several preliminary issues must be resolved before the substance of the motions can be addressed.

2. The 1991–92 IEP for Jackie indicates the following scores: reading comprehension, 9.0; word identification, 9.8; passage comprehen-sion, 7.0. In stark contrast, the 1990–91 IEP indicates a reading level of 3.7.

## Mootness

The defendants argue that this case is mooted by the fact that there was a new IEP in place for Jack to which his parents have apparently assented. Defendants contend that the 1990–91 IEP is the subject of this litigation and would not be in effect regardless of its legal sufficiency. Since the dispute concerning the 1990–91 IEP no longer exists, defendants suggest that this court lacks jurisdiction to hear the Straube's complaint.

■ Article III of the United States Constitution requires that there be a "case or controversy" before a federal court can render a decision. "However, where the offensive conduct is 'capable of repetition, yet evading review,' the rule that mootness strips the court of jurisdiction does not control." *Christopher P. by Norma P. v. Marcus*, 915 F.2d 794, 802 (2d Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 1081, 112 L.Ed.2d 1186 (1991), (quoting *Murphy v. Hunt*, 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982)). So where the complaining party would be subjected to the same action at some future point, mootness does not exist. *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975) (per curiam); *Daniel R.R. v. State Board of Education*, 874 F.2d 1036, 1040 (5th Cir.1989).

■ It cannot be disputed that the 1990–91 IEP is no longer applicable to Jack. Yet judicial review is still available in light of the ponderous procedures of the IDEA. *See Board of Educ. of the Hendrick Hudson Central School Dist. v. Rowley*, 458 U.S. 176, 186–87 n. 9, 102 S.Ct. 3034, 3041 n. 9, 73 L.Ed.2d 690 (1982) (allowing judicial review of an IEP which expired at the end of the school year); *Frutiger v. Hamilton Central School Dist.*, 928 F.2d 68, 73 (2d Cir.1991). Moreover, the issues raised by his parents in their challenge to that program still continue. Indeed, Jack's IEP for 1991–92 merely continues the regime which had already been deemed "inappropriate" by the IHO although we are cognizant that as a result of his year at Kildonan, his needs may have changed. Assuming that Jack's needs have not changed, the fact remains that there is a very real possibility that the school district will continue to give Jack another inappropriate placement unless the question of whether the school district is limited to choices from the "approved list" in making placements.

In addition, the crux of the Straubes' complaint is that the State has failed to provide a continuum of educational options for the severely dyslexic student. As placement in any of the schools on the State's approved list had not been recommended by either the IHO or the 1991–92 CSE, the fundamental problem complained of by the Straubes—namely, that no viable educational option for Jack was provided by the State—continues to exist. *See Honig v. Doe*, 484 U.S. 305, 320–21, 108 S.Ct. 592, 602–03, 98 L.Ed.2d 686 (1988) (lack of policy concerning school response to disability related misconduct could continue to result in IDEA/EHA violations which could affect plaintiff who was 20 years old and still eligible for educational services); *Daniel R.R.*, 874 F.2d at 1041 (primary controversy concerning extent of State's mainstreaming obligation likely to recur each year). We do not find therefore that his claim is moot.

## Eleventh Amendment

■ The IDEA abrogates the Eleventh Amendment for violations occurring in whole or in part after October 30, 1990. 20 U.S.C. § 1403. The State defendants argue that any of their actions giving rise to this suit took place prior to October 30, 1990 and that this action is therefore barred. It is true that any actions of the State with respect to the IEP in 1990–91 and the administrative hearings took place prior to October 30, 1990 and may not serve as a basis for this suit. For example, any interference by the State in the settlement negotiations between the school district and the Straubes occurred prior to October 30, 1990 and is therefore not actionable.

■ In addition, the plaintiffs claim that the State has failed to provide a continuum of placement alternatives for dyslexic students. The unavailability of a proper place-

ment for Jack in August 1990 when his IEP was written continued past October 30, 1990 and had a proper placement been available, plaintiffs contend that an appropriate IEP could have been created at some point for Jack. We had stated in an earlier decision that the State could be found liable on the basis that it had failed to provide a continuum of options for the severely learning disabled students in violation of 34 C.F.R. 300.551, a harm which continued past October 30, 1990. *Straube v. Florida Union Free School Dist.*, 778 F.Supp. 774 (S.D.N.Y.1991). Although the State argues that it has provided this continuum, that assertion goes to the merits of this case, not to the issue of Eleventh Amendment immunity.

█ Moreover, to the extent that the plaintiffs are seeking prospective relief, the Eleventh Amendment is not a bar. *Edelman v. Jordan*, 415 U.S. 651, 677, 94 S.Ct. 1347, 1362, 39 L.Ed.2d 662 (1974). The Straubes seek an injunction ordering the State to expand the educational alternatives available for dyslexic students. They also seek a specific placement for Jack in the future. Neither request for relief is prohibited by the Constitution.

*Qualified Immunity*

█ The State officials also claim that they are entitled to qualified immunity from liability for civil damages. "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In addition, even where rights are clearly defined, an official is shielded by qualified immunity if it was objectively reasonable for him to believe that his acts did not violate those rights. *Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir.1991); *Robison v. Via*, 821 F.2d 913 (2d Cir.1987) (citing *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)).

█ The Commissioners of Education argue, citing no authority, that in the absence of Supreme Court precedent or Second Circuit precedent on point, a statutory right was not clearly established. We do not agree that Jack's right to a "free appropriate public education" was not a clearly established statutory right. The case law is replete with authority confirming that a handicapped child's right to equal educational opportunity is protected by the guarantees in the IDEA. *See, e.g., Rowley*, 458 U.S. at 181, 102 S.Ct. at 3038. Indeed, the IDEA, itself, so states. *See* 20 U.S.C. § 1400(c). Additionally, "in order to qualify for federal financial assistance under the Act, a State must demonstrate that it 'has in effect a policy that assures all handicapped children the right to a free appropriate public education.'" *Rowley*, 458 U.S. at 180–81, 102 S.Ct. at 3037–38 (quoting 20 U.S.C. § 1412(1)). Thus, it is very clear that the State has the ultimate responsibility for ensuring that each eligible child receives an appropriate education.

█ In addition, Sobol and Neveldine claim that their actions concerning the use of an approval process for private schools was objectively reasonable. While we have no quarrel with the use of a pre-approved list because it surely promotes efficiency in locating placements for eligible children, the plaintiffs' complaint is not with the use of an approval process but with the use of a process which prevents the list from containing educational options which would satisfy the requirement that a "continuum of alternative placements" be assured by the State. 34 C.F.R. § 300.551(a). If the State has not provided sufficient alternatives, then its behavior cannot be said to be objectively reasonable. Therefore, a factual determination is the necessary predicate to the availability of qualified immunity to the State defendants. That determination rests upon the resolution of the State defendants' motion for summary judgment.

*Cross–Motions for Summary Judgment*

A. The Individuals with Disabilities Education Act

█ The IDEA was passed to provide educational opportunity for handicapped

children when Congressional fact finding determined that many children with disabilities were either being excluded from the classroom or misplaced so that their education had no meaning. *Rowley*, 458 U.S. at 191, 102 S.Ct. at 3043 (citing H.R. Rep., at 2). The Act's stated purpose is to:

> assure that all children with disabilities have available to them … a free *appropriate* public education which emphasizes special education and related services designed to meet their unique needs, to assure that the right of children with disabilities and their parents or guardians are protected, … and to assess and assure the effectiveness of efforts to educate children with disabilities.

20 U.S.C. § 1400(c); *see Rowley*, 458 U.S. at 179–84, 102 S.Ct. at 3037–39. The Act gives disabled students a substantive right to public education and conditions federal assistance upon a State's compliance with the substantive and procedural goals of the Act. *Honig v. Doe*, 484 U.S. at 310, 108 S.Ct. at 597; *Robert D. v. Sobel*, 688 F.Supp. 861, 862 (S.D.N.Y.1988).

The "free appropriate public education" required by the IDEA must be tailored to each child's unique needs and take place in the least restrictive environment suitable for the child. 20 U.S.C. §§ 1400(c), 1412(5)(B). Free appropriate education requires "personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Rowley*, 458 U.S. at 203, 102 S.Ct. at 3049.

To develop the proper program for each eligible child, the IDEA mandates an individualized education program, or IEP, for each eligible child. The IEP, prepared at meetings between the school district, the child's teacher, and the child's parents or guardians, defines the child's present edu-cational performance, establishes annual and short-terms objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives. 20 U.S.C. § 1401(19); *see Heldman v. Sobol*, 962 F.2d 148, 151 (2d Cir.1992). The IDEA requires that the IEP be reviewed and, if necessary, revised, no less than annually. 20 U.S.C. § 1414(a)(6). The end result of an IEP is a placement which is intended to meet that child's educational needs.[3]

The regulations promulgated pursuant to the IDEA require that "a continuum of alternative placements [be] available to meet the needs of handicapped children for special education and related services." 34 C.F.R. § 300.551(a). The continuum must include, among other things, audiology, counseling, and medical services in addition to occupational and physical therapy, and recreation. *Id.*, at § 300.551(b); *see id.*, at § 300.113.

Recognizing that on occasion the school district is unable to provide sufficient support services to the disabled child, the IDEA gives the State the option of providing free public education in private schools and facilities. 20 U.S.C. § 1413(a)(4)(B)(i) (1990). In such instances, "the [s]tate educational agency shall determine whether such schools and facilities meet standards that apply to [s]tate and local educational agencies." *Id.* § 1413(a)(4)(B)(ii). In New York, placement in private residential schools is permitted provided that the school has been approved by the Commissioner of Education. N.Y. Educ. Law § 4402(2)(b)(2). In the Spring of 1990, New York had a list of over 170 private schools which were approved for special education placements. *See* New York State's List of

---

**3.** It is worth noting that the structure of the Act encourages the mainstreaming of disabled children into the regular classroom setting whenever possible. *Honig v. Doe*, 484 U.S. at 311, 108 S.Ct. at 597; *Daniel R.R.*, 874 F.2d at 1044; *Lachman v. Illinois State Board of Education*, 852 F.2d 290, 295 (7th Cir.), *cert. denied*, 488 U.S. 925, 109 S.Ct. 308, 102 L.Ed.2d 327 (1988). Mainstreaming is intended to provide handicapped children with the benefits to be derived by interacting with their peers. It is generally accepted that the goals of mainstreaming and placing the handicapped child in the most suitable academic environment can conflict and that one of the decisions to be made in developing an appropriate IEP is the proper balancing of two desirable ends. *See, e.g., Daniel R.R.*, 874 F.2d at 1045. To the largest extent possible, Jack was mainstreamed.

Approved In–State and Out–of–State Private and Special Act School Districts for Children with Handicapping Conditions (Spring 1990). Of these, seven had programs for severely learning disabled students in their mid-teens.[4] Two of those schools offered residential placements.

B. The Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that the trial judge shall grant summary judgment if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law. The threshold inquiry is whether there are genuine factual issues that must be resolved by a finder of fact because they may reasonably be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). On cross-motions, the rule governing inferences and burden of proof remains the same. In deciding whether the moving party is entitled to judgment as a matter of law, all inferences must be drawn against the moving party, *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962), and reasonable minds must not differ as to the import of the evidence before the court, *Cable Science Corp. v. Rochdale Village, Inc.*, 920 F.2d 147, 151 (2d Cir.1990).

Here, each party asserts that the material facts in this case are undisputed warranting judgment in its favor as a matter of law. It is evident, however, that there are factual disputes. But even a dispute of fact does not preclude summary judgment if the dispute is not material to the issue to be determined. *Western World Insurance Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990); *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 11–12 (2d Cir.1986), *cert.*

*denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

C. Was the IDEA Violated?

Under the IDEA, Jack Straube is entitled to a "free appropriate public education." Jack has been educated in the Florida public schools since 1980. He was classified as learning disabled in 1983 and it is now contended that his education has not been appropriate. Specifically, plaintiffs argue that in light of Jack's lack of progress from 1984 to 1990, the placement chosen in the 1990–91 IEP was inappropriate. The defendants do not contest Jack's lack of progress. Florida instead contends that its hands were tied because the State did not make appropriate placements available; the State asserts that it provided sufficient educational options and any failures were due to the failure of the school district to comply with the requirements of the IDEA.

The State and the local educational agency receiving federal funds are both charged with the duty of providing handicapped children with appropriate educations. *See* 20 U.S.C. § 1414(a); *id.*, at § 1414(d) (if local educational agency is unable to furnish free appropriate education, state shall provide appropriate programs); 34 C.F.R. § 300.600. The IDEA states that " 'free appropriate public education' means special education and related services that—a) have been provided at public expense, under public supervision and direction, and without charge, b) meet the standards of the State educational agency, c) include an appropriate preschool, elementary, or secondary school education in the State involved, and d) are provided in conformity with the individualized education program required under section 1414(a)(5) of [the Act]." 20 U.S.C. § 1401(18).[5] An

---

**4.** These schools were: Lorge School, New York, New York; Summit School, Forest Hills, New York; Wildwood School, Schenectady, New York; Gustavus Adolphus Learning Center, Jamestown, New York; Community School of Bergen County, Teaneck, New Jersey; Community High School, Demarest, New Jersey; and Pathway School, Jeffersonville, Pennsylvania. Only the Pathway School and the Adolphus Learning Center offered residential placements.

With the exception of the Community School and the Community High School, none of the day placements would be feasible because they are located too far from Jack's home in Orange County to make a commute feasible.

**5.** Section 1414(a)(5) is the requirement that the IEP be established and revised no less than annually. 20 U.S.C. § 1414(a)(5).

appropriate education is therefore provided when personalized educational services are provided. *Rowley*, 458 U.S. at 197, 102 S.Ct. at 3046.

■ What the Act is not intended to do is to require States to provide services which maximize each child's potential or to achieve strict equality of opportunity or services. *Id.*, 458 U.S. at 198, 102 S.Ct. at 3046; *Rettig v. Kent City School Dist.*, 720 F.2d 463, 466–67 (6th Cir.1983), *cert. denied*, 467 U.S. 1201, 104 S.Ct. 2379, 81 L.Ed.2d 339 (1984); *A.W. By and Through N.W. v. Northwest R–1 School Dist.*, 813 F.2d 158, 163–64 (8th Cir.), *cert. denied*, 484 U.S. 847, 108 S.Ct. 144, 98 L.Ed.2d 100 (1987). Instead, the Act creates a "basic floor of opportunity" which consists of "access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Rowley*, 458 U.S. at 201, 102 S.Ct. at 3048. The IDEA opens "the door of public education to handicapped children on appropriate terms [rather] than [ ] guarantee[ing] any particular level of education once inside." *Id.*, 458 U.S. at 192, 102 S.Ct. at 3043. Thus, the education secured by the IDEA is not one that will maximize potential or the best possible but instead simply appropriate. *Id.*, at 197 n. 21, 102 S.Ct. at 3046 n. 21; *Springdale School District # 50 of Washington County v. Grace*, 693 F.2d 41, 43 (8th Cir.), *cert. denied*, 461 U.S. 927, 103 S.Ct. 2086, 77 L.Ed.2d 298 (1982); *Greer By and Through Greer v. Rome City School Dist.*, 762 F.Supp. 936, 941 (N.D.Ga.1990), *aff'd*, 950 F.2d 688 (11th Cir.1991), *withdrawn on other grounds*, 956 F.2d 1025 (1992). *See Tucker v. Bay Shore Union Free School Dist.*, 873 F.2d 563, 567 (2d Cir.1989) ("The [IDEA] guarantees to a handicapped child an education that is 'appropriate,' not one that provides everything that might be thought desirable by 'loving parents.' ").

■ Providing an appropriate education for dyslexic students is the obligation of both New York State and the Florida Union Free School District. The parties agree that at the time the 1990–91 IEP was written, Jack was reading at a level far too low to be commensurate with what appears to be average to high average intelligence. As a result, we must agree with the plaintiffs and the IHO that the special education provided to Jack up to 1990 failed and certainly had not been appropriate. Yet, failure of special education does not necessarily state a claim under the IDEA so long as the State has complied with the procedures set forth in the Act and the IEP was reasonably calculated to enable the child to receive educational benefits. *Rowley*, 458 U.S. at 206–07, 102 S.Ct. at 3051.

■ The Straubes contend that the State Education Department has not complied with IDEA procedures because 1) New York has not provided a continuum of alternative placement options and 2) New York requires that districts must select private school placements from a pre-approved list which is not representative of private schools nor provides for all handicapping conditions.[6] While no one has suggested that the 1990–91 IEP as originally proposed for Jack was appropriate, the State contends that there were other options available for placement and that it has therefore complied with the IDEA.[7]

---

**6.** The plaintiffs also challenge the State's inclusion of dyslexia in the category of learning disabilities rather than designating it as a distinct handicapping condition. Federal regulations do not separate dyslexia from other learning disabilities. The IDEA lists categories of children who should be considered "handicapped." *See* 20 U.S.C. § 1401(a)(1)(A). Included is a category for "specific learning disabilities" which encompasses perceptual handicaps, brain injury, minimal brain dysfunction, dyslexia and developmental aphasia. 34 C.F.R. Pt. 104, App. A; 34 C.F.R. § 300.5(9). There is no requirement under the IDEA that every variation of disability be addressed separately by

state policy so long as an appropriate education can be provided to each handicapped child, no matter what disability makes him or her eligible for special educational services.

**7.** It should be noted that the IHO found that there were no placements available. However, he may have drawn that conclusion based on limited information because it appears that only schools in the Hudson Valley region were contacted regarding placement of Jack. The State never suggested any other placements at the hearing although its representative was never asked that question. It is the State's position

Plaintiffs suggest that the "continuum of alternative placement options", required by 34 C.F.R. § 300.551(a), imposes a duty upon the state to ensure that there be a placement option specifically suited for Jack's particular needs and goals. We do not agree. There is no obligation under the IDEA for a school district to provide a specific program or employ a specific methodology in providing for the education of children with disabilities. *Lachman,* 852 F.2d at 297. Instead, the continuum must "make provision for supplementary services (such as resource room or itinerant instruction) to be provided in conjunction with regular class placement", *id.,* at § 300.551(b)(2), and provide related services such as transportation and "such developmental, corrective, and other supportive services as are required to assist a handicapped child to benefit from special education," *id.,* at § 300.13(a). Consequently, the continuum must include alternative placements and supplementary services in conjunction with regular class placement. *Daniel R.R.,* 874 F.2d at 1043; *Greer,* 762 F.Supp. at 939–40.

The possible placements that the State must provide are not intended to provide the "best" available education but rather "appropriate" education. *Greer,* 762 F.Supp. at 941. The local educational authorities can make choices and allocate scarce resources without the courts intervening in their choices so long as sufficient options are available to provide reasonable opportunities for the disabled child. *Rowley,* 458 U.S. at 208, 102 S.Ct. at 3052; *A.W. v. Northwest,* 813 F.2d at 164; *Barnett v. Fairfax County School Board,* 721 F.Supp. 757, 762 (E.D.Va.1989) (school district needs to provide only one method for educating hearing impaired children despite availability of other methods which may be more suited), *aff'd,* 927 F.2d 146 (4th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 175, 116 L.Ed.2d 138 (1991). The purpose of the continuum is to ensure that a variety of choices are available so that an IEP can be constructed which ensures an *appropriate* education. An appropriate education is one that should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade. *Rowley,* 458 U.S. at 204, 102 S.Ct. at 3049. There was never a requirement that New York have a placement available for Jack which maximized his potential or provided him with the best education. So long as a placement was available which would have afforded educational benefit, the continuum has been satisfied. *Id.,* 458 U.S. at 203, 102 S.Ct. at 3049; *Greer,* 762 F.Supp. at 941 n. 7. *Cf. Barnett v. Fairfax County School Board,* 721 F.Supp. at 761 (hearing impaired student who wanted to attend local high school but was receiving B grades in centralized program had no claim under EHA).

It is against these standards that we must evaluate the education that Jack has received and the opportunities that are available to him. Up to sixth grade, Jack was mainstreamed with one hour daily in the resource room. These IEPs were consistent with the priority placed on mainstreaming by Congress. When it became apparent that Jack was having problems in a regular classroom, he was assigned to a self-contained special education class for all of his academic subjects except Spanish.[8] Although Jack was promoted each year, he did not necessarily pass each subject. The record suggests that we cannot totally rely on the *Rowley* standard to assess the educational benefit derived by Jack because the continual decrease in his grades and

now that other placement options were and are available for Jack's education.

**8.** At some point, counseling was also recommended. Plaintiffs contend that the recommended counseling was rarely provided. This was confirmed by the testimony of Dr. Friedman, the chairman of the CSE and a psychologist in the Florida school district at the impartial hearing. We will consider this fact if we find that the plaintiffs are entitled to damages.

Jack's behavior in the classroom was described as disruptive and interfered with the instructional process. Affidavit of Rebecca Spar, at Pa 55. It was observed that when Jack felt a subject was worthwhile such as ninth grade mathematics, he could achieve good grades. Indeed, an educational psychologist noted that Jack would sit quietly and persevere in a task that he deemed meaningful. *See id.,* at Pa 143.

the failure of his reading level to move up in six years suggests that perhaps Jack was being moved from grade to grade in order to get him through the system. The continual lack of achievement and educational progress suggests that the IEPs developed for Jack did not yield any educational benefit. Thus, we would agree with the IHO that the IEP proposed for 1990–91 which would continue the programs of previous years could only be deemed inappropriate. Jack's movement from grade to grade, for whatever reason, cannot be deemed the progress that an appropriate education would have brought.

■■■ When education within the regular school system is not effective, as clearly it was not in this case, then a private placement must be considered by the educational agencies. *See Roncker on Behalf of Roncker v. Walter*, 700 F.2d 1058 (6th Cir.), *cert. denied sub nom, Cincinnati City School Dist. Bd. of Educ. v. Roncker*, 464 U.S. 864, 104 S.Ct. 196, 78 L.Ed.2d 171 (1983). Assuming that a private placement was the necessary choice for the 1990–91 IEP, we have been returned to the question of whether in its private placement approvals, the State provided a continuum of alternative placements. This question invites us into investigating state educational policies and facilities which is far beyond the scope of review permitted.[9] We are nevertheless compelled by the claims raised by these plaintiffs to assess the placements which exist on the "pre-approved" list. In doing so, we are cognizant that we "lack

the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy.'" *Rowley*, 458 U.S. at 208, 102 S.Ct. at 3052 (quoting *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. at 42, 93 S.Ct. at 1301).

It seems to us that a "continuum of alternative placements" exists if the pre-approved list contains private placement alternatives for male teenagers with dyslexia.[10] The Regional Supervisor with the Office for Special Education Services of the New York State Education Department has provided an affidavit which states that nine schools in the Lower Hudson Valley Region are potentially capable of providing services to a child with dyslexia. We do not agree that three of those recommendations are appropriate[11]; moreover, none of these schools are recommended for severely learning disabled students.

■■■ There is no requirement though that a child receive a residential placement located in his immediate geographic area although it is preferable. Assuming that Jack is severely dyslexic and that he must be consequently classified as severely learning disabled, our review of the pre-approved list reveals seven placement options on the approved list for Jack. *See* footnote 3, *supra*.[12] Only two of these schools offer residential placements. The other schools are not located near Jack's home. However, that fact does not mean that they are not appropriate placements. Indeed, the Straubes considered the Com-

**9.** As stated earlier, in suits brought under 20 U.S.C. § 1415(e)(2), the court must ask 1) has the State complied with the procedures set forth in the Act and 2) is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits. *Rowley*, 458 U.S. at 206–07, 102 S.Ct. at 3051.

**10.** The plaintiffs criticize the State's classifications because New York does not recognize dyslexia as a handicapping condition distinct from a general category of learning disabled. This is not a problem so long as the needs of dyslexic children are addressed in the placement options provided by the state.

**11.** The Astor Learning Center does not take children over the age of 13. Jack was 15 at the time a placement was under consideration. The

Children's Home of Kingston and the Summit School only take learning disabled children who are emotionally disturbed which Jack is not. Other schools recommended by the Regional Supervisor which might possibly be appropriate placements were the Karafin School in Mount Kisco, the UCP of Ulster County, Sugar Loaf UFSD, Greenburgh Graham UFSD although these schools do not indicate that they serve the severely learning disabled student.

**12.** The Office of Civil Rights of the United States Department of Education, found that nine of the schools on the list of approved private schools had actually served dyslexic students. Exh. A, p. 3. We do not know how many of these schools can address properly severe dyslexia.

munity School, located in northern New Jersey, a viable option and they acknowledge that with the exception of the Community School, they simply did not consider applying to any other school on the list. Notice of Cross–Motion for Summary Judgment in Favor of Sobol and Neveldine, Exh. D, at 114. The Straubes acknowledge that had Jack been accepted, they would have sent him to the Community School. The fact that Jack was not accepted does not mean that the State has failed in its duty to provide a possible placement for Jack. *See Antkowiak by Antkowiak v. Ambach,* 838 F.2d 635 (2d Cir.1988) (court would not order placement in unapproved school despite child's rejection by six in-state residential facilities).

The plaintiffs argue that no other schools on the list were within the continuum because none of the schools met the exact requirements of the Straubes. They claim that their advocate contacted all the approved private day and residential schools in the Hudson Valley Region and asked:

> Do you have a program for average to above average intelligence for a 15 year old boy with severe dyslexia, reading at a second grade level, and with Attention Deficit Disorder? Is the program a reading/language based curriculum which will remediate the disability while at the same time provide a college prep curriculum?

The plaintiffs claim that without exception the answer was no.[13] The problem is that the plaintiffs had too high expectations for what the placement options were to do. An appropriate program is not a perfect program nor one that maximizes potential. An appropriate program is one that will move the child along academically, not one that will guarantee college entrance. Thus, the Straubes' rejection of a program which had a vocational focus was unreasonable because it indicated a lack of understanding of what the IDEA was intended to achieve. *See Daniel R.R.,* 874 F.2d at 1048 ("States need not provide every conceivable supplementary aid or service to assist the child."). Moreover, other than the statement by their advocate, *see* footnote 13, *supra,* the plaintiffs have not offered any credible evidence to show that any of the other schools on the pre-approved list were not appropriate placements for Jack. Plaintiffs cannot "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Insurance,* 804 F.2d at 12. Thus, we conclude that New York State offered a continuum of placement options which satisfied the requirements of the federal statute.

The plaintiffs also claim that the State in mandating that placements be made from a pre-approved list was violating the procedures of the IDEA. The IDEA requires that a private placement be in a school whose program meets the standards of the State. 20 U.S.C. § 1401(18). The list maintained by New York is a compilation of those schools who have met state requirements[14] and maintenance of

---

**13.** Marilyn Arons, the Straubes' advocate, summarized the responses she claimed she received from these schools as follows:

> We have a mixed E.D. and L.D. population. We do not specialize in learning disabilities. Our program is a behavior modification program. The program described only exists in elementary schools. By the time a student reaches 15, vocational education becomes the primary focus. Our L.D. population is generally lower functioning and not average to above average in intelligence.

Plaintiffs' Responsive Statement Pursuant to Local Rule 3(g), Affidavit of Marilyn Arons (May 18, 1992), at ¶ 6. There is no objective evidence supporting her assertion that she contacted all of the schools on the list and received the answer as described from each school.

**14.** General criteria for approval is an assurance that all laws and regulations will be complied with and that the school has an ability to serve children with handicapping conditions. Applications are accepted only from chartered schools and must include a financial statement from an independent certified public accountant. Staff members from the Commissioner of Education's office then conducts an on-site visit to review its facilities and programs.

The specific standards for approval do not appear to be codified in any one place nor has any evidence been adduced by the defendants to indicate what factors would merit approval. Indeed, one of plaintiffs' complaints is that the approval standards appear to be nebulous.

such a list is not unusual. *See Cordero by Bates v. Pennsylvania Dept. of Education*, 795 F.Supp. 1352, ——, (M.D.Pa. 1992). Indeed, so long as there are sufficient placement options on the list and the process in electing a placement from the list does not take an unreasonably long period of time, restricting the choice of placements of those schools on a pre-approved list is not a violation of the IDEA. *Id.; see Antkowiak*, 838 F.2d at 641 (state may not add additional steps not contemplated in the scheme of the Act even if the procedures are intended to add additional safeguards for the handicapped student). In this case, we have concluded that there were options on the list for Jack. There is no evidence that a placement, if one was sought, could not have been obtained in an acceptable amount of time. We do not find, therefore, that the use of a pre-approved list is illegal.

Plaintiffs also urge that requiring schools to apply for approval before placements can be made limits the options available for placement. Assuming that the pre-approved list has no viable options, this argument has some force. But plaintiffs have not demonstrated that there are no placements for Jack which will provide him with an appropriate education.

### D. *Failure to Provide an Appropriate IEP*

 We agree with the IHO that the Florida Union Free School District failed to provide Jack with an appropriate IEP. His progress from grade to grade was not sufficient, in our view, to indicate that he was receiving the educational opportunity to which he was entitled. The School district does not bear the total fault for this affair. The State bears ultimate responsibility for ensuring that every eligible child has an appropriate placement. *Honig v. Doe*, 484 U.S. at 329, 108 S.Ct. at 607; *see* 20 U.S.C. § 1414(d)(1); *Todd D. by Robert D. v. Andrews*, 933 F.2d 1576, 1582 (11th Cir.1991). Even though the State may have satisfied its direct duties, it is essentially responsible for the actions taken by the local educational agency. "Each state educational agency is ultimately responsible for ensuring that each agency in the State is in compliance with the IEP requirements and the other provisions of the Act and regulations." 34 C.F.R., App. C, Question 1; *see id.*, at § 300.600(a)(1). "[T]he state's role amounts to more than creating and publishing some procedures and then waiting for the phone to ring. The IDEA imposes on the state an overarching responsibility to ensure that the rights created by the statute are protected, regardless of the actions of local school districts." *Cordero by Bates*, 795 F.Supp. 1352 (citing *Honig v. Doe*, 484 U.S. 305, 108 S.Ct. at 592).

In addition, Jack's parents must share some responsibility for the shortcomings in his education. They were cognizant of Jack's lack of progress and yet acquiesced in the same type of IEP year after year despite being quite aware of their due process rights. The structure of the IDEA presumes that a child's parents or guardians will arduously seek to ensure that the child receives all of the benefits to which they are entitled by the Act. *Rowley*, 458 U.S. at 209, 102 S.Ct. at 3052. The Straubes did not demonstrate this ardor and as a result it became very easy for the school district to provide Jack with what appears to be inappropriate and minimal services.

We conclude that Jack did not receive an appropriate IEP for the school year 1990–91 and therefore a violation of the IDEA has occurred.

### E. *Appropriate Relief*

 The plaintiffs are seeking to have Jack placed at Kildonan for the 1992–93 school year. As Kildonan is not on the list of approved schools, we cannot order such relief. *Tucker v. Bay Shore Union Free School Dist.*, 873 F.2d at 568; *Antkowiak*, 838 F.2d at 640. In addition, we will not order Jack's placement because we feel it is the province of the local educators to make that decision. We thus remand this matter to the Committee on Special Education with instructions to develop an Individualized Education Program for Jacob Straube which will address his particu-

lar needs. If Jack made satisfactory progress [15] in his last year at S.S. Seward Institute, then the CSE may develop an IEP to be based in the district's high school that it believes is appropriate. If, on the other hand, Jack made no progress in his last year in the public school or regressed from the achievements attained in his year at Kildonan, then the CSE is not to order special education classes and time in a resource room because· the record is quite clear that such a program will not do the job. Instead, the CSE is ordered to explore the possibility of a private placement on the approved list, using New York's Residential Placement System. *See* Affidavit of Hannah Flegenheimer (May 15, 1992), at ¶ 16.

▮▮▮▮▮ If no appropriate placement is available or if Jack is not accepted by any of the schools, we are then left with a difficult situation. It is quite plain in the Second Circuit that a placement may not be made in an unapproved school. Yet the situation may come up where that is the only option. Even in such situations, the courts in this Circuit have adhered to the position that a school must be approved by the State before placements funded by the IDEA can be made. *Antkowiak*, 838 F.2d at 640–41; *Matthew S. by Steven S. v. Sobol*, 1991 WL 12184 (S.D.N.Y. January 29, 1991); *Hiller v. Board of Education of*

*the Brunswick Central School Dist.*, 687 F.Supp. 735, 742 (N.D.N.Y.1988).

Thus, should a residential placement be needed and none is available, the State is ordered to expand the alternative placements on its list. *See Cordero v. Bates*, 795 F.Supp. 1352 (ordering State to provide timely placements for handicapped children who are on waiting list due to lack of approved schools). If the CSE and the Straubes, working with the State authorities determine that Kildonan would be an appropriate placement, the State must take affirmative steps to provide conditional approval for the school.[16] We are cognizant that there may be very valid reasons why Kildonan is not approved for New York placements. But if the only objection to Kildonan is its refusal to designate itself as a school for the handicapped and the school in all other ways meets state conditions, New York should provide conditional approval for the school and pay for Jack's tuition during the 1992–93 school year. The CSE is given thirty days from the date of this decision to notify this court of what IEP has been developed. (This limited period is necessary in light of the imminence of the school year's commencement.)

We emphasize that Kildonan is not an option until the CSE and the Straubes have exhausted all efforts to locate an appropriate placement within the parameters currently set by the State. This court will not

---

**15.** Jack's progress will be measured by comparing his scores in language arts, reading and mathematics at the end of the school year in 1991 with his scores at the end of the school year in 1992. Also taken in account will be his behavior, attitude towards school, and effort put into school work as measured by comparisons between reports written by his teachers at Kildonan and at S.S. Seward Institute.

**16.** New York will not waive its requirement that local educational agencies use only private schools contained in the pre-approved list when a child must be placed in a private school. *See* Plaintiffs' Statement Pursuant to Rule 3(g), ¶ 31; State's Counter 3(g) statement, ¶ 9. New York does allow conditional approval upon the submission of certain documents and an on-site program review visit. 8 N.Y.C.R.R. 200.-7(2)(i)(a)-(d). Conditional approval still requires that a school seek approval. Kildonan has declined to apply for approval from New York because the school chooses not to designate itself as a school for the handicapped, apparently a requirement of New York. *See In the Matter of J. and J.S., Parents, on behalf of their son, J.S.*, Transcript of Hearing before Impartial Hearing Officer Earle Warren Zaidins (October 4, 1990), at 1230, 1243–46. Kildonan is approved by New Hampshire, California, Pennsylvania and in the past New Jersey on a case by case basis when no other placement is appropriate for the child.

A school cannot be compelled to apply for approval, but the State can approach Kildonan. If Kildonan meets the State's requirements in every other way except for the way it designates itself, it seems arbitrary to allow semantics to stand in the way of what would be an appropriate placement option for Jack. While the IDEA requires the States to set the standards for the private placement schools, if the only standard not met is clearly unreasonable, then that standard must be dropped.

view lightly any lack of diligence on the part of the Florida School District and the Straubes to circumvent the State's procedures in order to obtain a placement at Kildonan.

### F. Damages

■ The Straubes seek compensatory damages for the tuition paid to Kildonan during the school year of 1990–91 and their related expenses such as transportation and counseling. Under the law of the Second Circuit, parents may not be reimbursed for the unilateral placement of their child in an unapproved private school even if that placement would have been appropriate under the IDEA. *Tucker*, 873 F.2d at 568; *Antkowiak*, 838 F.2d at 640–41. Other Circuits have not followed this rule, *see Carter v. Florence County School Dist. Four*, 950 F.2d 156 (4th Cir.1991), and a petition for certiorari has been filed in the *Carter* case. 60 U.S.L.W. 3689 (1992). We, however, are bound by the law in the Second Circuit. Therefore, the Straubes are not entitled to reimbursement for the year of tuition at Kildonan.

■ As noted in an earlier footnote, Jack's 1989–90 IEP called for weekly counseling. It is uncontested that Jack did not receive this counseling because of staffing shortages in the school district. His 1990–91 IEP also called for weekly counseling. Whether the counseling would have been provided is speculative because of the Straubes' unilateral placement of their son at Kildonan. However, Jack was entitled to a year of counseling which he did not receive. In lieu of ordering a year of counseling which Jack would receive anyway as part of a future IEP if counseling were deemed necessary, we order the school district to compensate the Straubes for the $1,320 they spent to provide Jack with counseling during the 1990–91 school year. *See Max M. v. Illinois State Bd. of Educ.*, 629 F.Supp. 1504, 1519 (N.D.Ill.1986). If Jack's 1992–93 calls for counseling, we order the Florida School District to ensure that he receives that counseling as called for by the IEP. If staffing shortages exist, then the school district must arrange for appropriate counseling through private providers.

The Straubes have also requested that compensatory education be ordered for Jack to compensate for all of the years that he did not receive a "free appropriate public education." Specifically, the plaintiffs would like Jack to receive his high school diploma and have the defendants pay Jack's tuition at a college which specializes in education of dyslexic students.

■ Although Jack can receive compensatory education beyond his twenty-first birthday, *Burr by Burr v. Ambach*, 863 F.2d 1071, 1078 (2d Cir.1988), *reaffirmed*, 888 F.2d 258 (2d Cir.1989), *cert. denied*, 494 U.S. 1005, 110 S.Ct. 1298, 108 L.Ed.2d 475 (1990), it cannot be granted in the form of college tuition. The IDEA directs funds into special education at elementary and secondary schools and there is no provision in the Act for the payment of funds for post-secondary education. But a student may receive educational services in compensation for services which were not provided even while the student is attending college. *See Puffer v. Raynolds*, 761 F.Supp. 838 (D.Mass.1988). The Florida Union Free School District is ordered to provide Jack with one year of remedial educational services after his graduation from high school. We recognize that Jack's future educational needs are not immediately knowable. However, that does not foreclose our ability to order that to which he is entitled which is deprivation of a "free appropriate public education" in the 1990–91 school year. *Lester H. by Octavia P. v. Gilhool*, 916 F.2d 865, 868 (3d Cir. 1990), *cert. denied sub nom., Chester Upland School Dist. v. Lester H.*, —— U.S. ——, 111 S.Ct. 1317, 113 L.Ed.2d 250 (1991).

After Jack's graduation from high school, the Committee on Special Education, the State and the plaintiffs are ordered to develop a compensatory program which will take into account Jack's educational status at that time and whatever progress he has made in the interim. *See Puffer*, 761 F.Supp. at 853.

Finally, we turn to the plaintiffs' request for costs and money damages. Plaintiffs are entitled to be reimbursed for the costs associated with the due process hearing. Those costs are $1,045 paid to an educational consultant and $1,172 for the cost of an attorney. We will not make this award now but wait until an application for attorneys' fees and costs has been submitted.[17]

Mrs. Straube seeks compensation for the time expended raising funds to pay for Jack's tuition at Kildonan. These efforts may not be compensated. The value of contributed parental services may be considered as damages only when those efforts were made in providing services to which the child was entitled as a matter of law. For example, in *Hurry v. Jones*, 734 F.2d 879 (1st Cir.1984), the parents were reimbursed for the time and expenses involved in transporting their son to school. The child was entitled to door-to-door transportation to and from school which he had not received in violation of the Education for Handicapped Act (now the IDEA). Additionally, the court found that the damages sought by the parents were no greater than what would have been paid for transportation services during that period of deprivation because the driver's time is a normal component of transportation costs. *Id.*, 734 F.2d at 884. In contrast, the Straubes were not entitled to reimbursement for the tuition paid to Kildonan and their time was not expended on delivering services to Jack but on raising money. Thus, under the IDEA they are not entitled to compensation.

### CONCLUSION

Plaintiffs' motion for summary judgment is granted in part and denied in part. New York's motion for summary judgment is granted in part and denied in part. Florida Union Free School District's motion for summary judgment is denied. Plaintiffs

are to submit an order within ten days of this decision.

SO ORDERED.

---

17. We will note that while expert fees are recoverable by a prevailing party, the Straubes have not paid such fees but instead agreed to attempt to recover these fees should they prevail. Additionally, the time of lay advocates, although

extraordinarily valuable to this case, may not be recompensed under the IDEA. The Act makes provision for attorneys' fees; Ms. Arons, Mr. Gaynor and Ms. Gaynor are not attorneys.