COREY H., Latricia H., Andrew B., and Jason E., by their parents and next friends, Shirley P., Beverly H., Sharon B. and Stephen E., on their own behalf and on behalf of a class of similarly situated persons, Plaintiffs,

v.

The BOARD OF EDUCATION OF THE CITY OF CHICAGO, Paul G. Vallas, Chief Executive Officer of the Chicago Public Schools, The Illinois State Board of Education, and Joseph A. Spagiolo, Illinois Superintendent of Education, Defendants.

No. 92 C 3409.

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 19, 1998.

John S. Elson, Laura J. Miller, Nancy S. Gibson, Chicago, IL, Sharon Merle Weitzman, Chicago, IL, for Plaintiffs.

Janet Bernice Johnson–Vinion, Pamela Elana Cash, Michael Joseph Hernandez, City of Chicago Bd. of Educ., Chicago, IL, Iris Ellen Sholder, Cook County Assessor's Office, Chicago, IL, for defendant's Board of Education of the City of Chicago, Ted D. Kimbrough.

Paula J. Giroux, Chicago, IL, for defendants Illinois State Board of Education, Robert Leininger.

## MEMORANDUM OPINION AND ORDER

GETTLEMAN, District Judge.

### I. INTRODUCTION

Children with disabilities in the Chicago public schools have been and continue to be segregated into separate and unequal educational environments, contrary to established federal law. Although the local school district has recognized its deficiencies and agreed to a remedial plan, the State educational agency has continued to deny its responsibility. As discussed below, that denial squarely conflicts with the clear Congressional intent to make the State ultimately responsible for compliance with the long-standing federal mandate that children with disabilities be educated in the least restrictive environment ("LRE").

The LRE mandate was first enacted in the Education for All Handicapped Act of 1975 ("EAHCA"), and became effective on October 1, 1977.[1] In 1990, Congress replaced the prior statutory scheme with the Individuals With Disabilities Education Act ("IDEA").[2] In 1997, Congress reorganized, added and expanded various IDEA provisions in the reauthorization of the IDEA ("IDEA 1997").[3]

Foremost among the requirements of the IDEA is the mandate that children with disabilities be educated in the least restrictive environment. While the local schools and the children's parents are the "front line" providers of educational services for children with disabilities, the IDEA squarely places the ultimate responsibility for ensuring compliance with its mandates on the state educational agencies, such as the ISBE. 20 U.S.C. § 1412(6).

In 1992, several Chicago public school students with disabilities and their parents, on behalf of themselves and a putative class, brought this action against the City of Chicago Board of Education and its Chief Executive Officer (collectively, the "City" or the "CBE"), and the Illinois State Board of Education and its Superintendent (collectively, the "ISBE" or the "State"). Plaintiffs sought declaratory and injunctive relief to correct alleged systemic failures by the City and the ISBE to educate children with disabilities in the least restrictive educational environment, in violation of the IDEA. By order dated February 1, 1993, Judge Leinenweber, to whom this case had previously been assigned, denied motions to dismiss that had been filed by all defendants and certified the plaintiff class, consisting of all children who are enrolled in the Chicago public schools and are or will be classified by the CBE as having a disability.

1. Pub.L. 94–142, Nov. 29, 1975, 89 Stat. 781; 20 U.S.C. § 1412(5).

2. Pub.L. 101–476, Oct. 30, 1990, 104 Stat. 1103; 20 U.S.C. § 1400 et seq.

3. Pub.L. 105–17, June 4, 1997, 111 Stat. 37 (to be codified in 20 U.S.C. § 1400 et seq.). The provisions of IDEA 1997 are scheduled to take effect on various dates in 1997 and 1998. Pub.L. No. 105–17, 111 Stat. 156. However, because all of the alleged violations occurred before IDEA 1997, the court will refer to IDEA 1997 only to discuss substantive changes that are pertinent to the case.

After the class was certified, the parties engaged in extensive and prolonged settlement negotiations. On August 25, 1994, the court entered an "Agreed Order to Use Joint Experts," pursuant to which the parties selected three independent experts to conduct an inquiry into plaintiffs' allegations. It was hoped that the conclusions of these joint experts (which under the terms of the Agreed Order were not binding on any party) would form the basis of a reasoned, amicable settlement of this litigation and an early resolution that would benefit children with disabilities who were enrolled in the Chicago public schools.

The joint experts conducted an extensive, scientifically sound investigation and concluded that the City was seriously out of compliance with the LRE requirements of the IDEA. According to the joint experts, children with disabilities in the Chicago public schools are typically educated in overly restrictive placements. The joint experts concluded that the children's placements were based mostly on the categories or severities of their disabilities, rather than their individual needs. Both the City and the State were found to have failed to monitor or implement the principles of educating children with disabilities in the least restrictive environment, or to train teachers and other educational professionals in these principles.

After the joint experts communicated their conclusions to the parties, efforts were made to reach a global settlement. Negotiations broke down in late 1996, and the court set the case for trial in October of 1997. During the course of pretrial preparation, plaintiffs and the City reached a tentative settlement, which the court preliminarily approved on October 23, 1997. Notice of the proposed settlement was published and distributed to all children with disabilities currently enrolled in the Chicago public schools and, at a fairness hearing conducted on January 16, 1998, the court approved the settlement agreement with certain minor modifications. Under that agreement, the City will, over an eight year period, take actions designed to bring between one-third and one-half of its 553 schools into compliance with the IDEA's LRE mandate, at a total cost of approximately $24 million. A monitor [4] has been appointed to oversee the implementation of the agreement, which is already underway.

Unfortunately, plaintiffs and the ISBE could not reach a settlement, and the case against the ISBE went to trial as scheduled. At the trial, two of the three joint experts testified, along with other experts and administrative personnel from the City and the State.

As discussed in greater detail below, the trial vividly demonstrated in general the correctness of the joint experts previous conclusion that the City was and is severely out of compliance with the LRE mandate of the IDEA, and that the ISBE has not only failed to meet its statutory responsibility to ensure such compliance, but has in certain respects impeded compliance by what appears to be a disregard of its duties. The testimony of plaintiffs' witnesses—who were highly qualified and credible—demonstrated beyond doubt that the Chicago public schools have been and continue to be saddled with archaic notions of educating children with disabilities in restrictive placements determined more by the categories of their disabilities than by their individual needs, in clear violation of the IDEA.

Fortunately, the City, through its counsel and administrators, has recognized its past failures and has embarked on a program to correct them. Unfortunately, and inexplicably, the ISBE continues to deny the undeniable and defend the undefendable. The "case" it presented at trial was unpersuasive and unsupported by the facts and the law. An objective observer—including this court—can conclude only that the ISBE has engaged in this exercise more to delay the inevitable result than to change or avoid it.

In any event, the record established at trial compels judgment for plaintiffs and against the ISBE, declaring that the state

4. The monitor is Hon. Joseph Schneider, a retired state court judge who, at the time of his retirement, was Presiding Judge of the County Division of the Circuit Court of Cook County. Judge Schneider recently served as the court-appointed monitor of a class action settlement with the Illinois Department of Children and Family Services pending before Judge Grady. *B.H. v. Ryder* (No. 88 C 5599).

has been and is violating the LRE requirements of the IDEA, and enjoining future violations as more fully described in the remedy section below.

## II. *THE IDEA AND IMPLEMENTING REGULATIONS*

Congress enacted the IDEA and its predecessor statutes "to assure that all children with disabilities have available to them ... a free appropriate public education ...." 20 U.S.C. § 1400(c).[5] To effectuate this goal, Congress placed the ultimate responsibility of compliance with the state educational agency ("SEA"), declaring that in order for the State to receive federal IDEA funds, the SEA "shall be responsible for assuring that the requirements of this [Act] are carried out ...." 20 U.S.C. § 1412(6). To qualify for this assistance, each SEA must submit a plan to the Department of Education's office of Special Education Programs ("OSEP") detailing the state's policies and procedures that assure compliance with the Act. 20 U.S.C. §§ 1412–1413.

While the IDEA requires SEAs to develop and accept responsibility for many different policies and procedures, the LRE mandate requires that children with disabilities be educated in the least restrictive environment. 20 U.S.C. § 1412(5)(B). Pursuant to this statute, SEAs must establish "procedures to ensure that, to the maximum extent appropriate, children with disabilities ... are educated with children who are not disabled ...." 20 U.S.C. § 1412(5). To ensure compliance, Congress developed funding guidelines and procedural safeguards within the IDEA. Before explaining the LRE mandate, the funding formulas and the procedural safeguards, it is helpful to review the general responsibilities that the IDEA places on SEAs and local education agencies ("LEAs").

### A. The Relationship Between State and Local Agencies.

After the SEA submits a plan to OSEP, the SEA receives the IDEA funds from the Department of Education. Upon receiving these funds, the SEA is not only responsible for distributing the IDEA funds to each LEA, but is also responsible for assuring local compliance.

More specifically, in the SEA's application to OSEP, the SEA must submit a plan that assures, among other things, that: (1) funds received under the IDEA are expended in accordance with the provisions of the Act, 20 U.S.C. §§ 1413(a)(1)–(2); (2) an adequate number of special education personnel are adequately and appropriately trained through a comprehensive system of personnel development, 20 U.S.C. § 1413(a)(3); and (3) the SEA annually evaluates the effectiveness of the IDEA programs in meeting the educational needs of children with disabilities, 20 U.S.C. § 1413(a)(11).

In order to obtain the IDEA funds, each LEA must submit an application to the SEA setting forth assurances, *inter alia,* that: (1) funds will be used for programs that implement the provisions of the IDEA, 20 U.S.C. § 1414(a)(1); (2) the LEA will maintain records and furnish information as may be necessary for the SEA to perform its duties under the IDEA, 20 U.S.C. § 1414(a)(3); and (3) the LEA will establish or revise individual education programs ("IEPs") for each disabled child at the beginning of each school year, 20 U.S.C. § 1414(a)(5).

Thus, "[t]he State educational agency shall be responsible for assuring that the requirements of this [Act] are carried out ..." 20 U.S.C. § 1412(6). The federal regulations issued under section 1412(6), 34 C.F.R. section 300.600 explain in a note that the language of this provision:

... reflects the desire of the Congress for a central point of responsibility and accountability in the education of children with disabilities within each State. With respect to SEA responsibility, the Senate Report on Pub.L. 94–142 includes the following statements:

---

**5.** A "free appropriate education" is defined as "special education and related services that A) have been provided at public expense, under public supervision and direction, and without charge, B) meet the standards of the State educational agency, C) include an appropriate pre-

school, elementary, or secondary school education in the State involved, and D) are provided in conformity with the individualized education program ("IEP") required under section 1414(a)(15) of this title." 20 U.S.C. § 1401(a)(18).

This provision is included specifically to assure a single line of responsibility with regard to the education of handicapped children, and to assure that the implementation of all provisions of this Act and in carrying out the right to education for handicapped children, *the State educational agency shall be the responsible agency* \*\*\*.

Without this requirement, there is an abdication of responsibility for the education of handicapped children. Presently, in many states, responsibility is divided, depending upon the age of the handicapped child, sources of funding, and type of services delivered. While the Committee understands that different agencies may, in fact, deliver services, the responsibility must remain in a central agency overseeing the education of handicapped children, *so that failure to deliver services or the violation of the rights of handicapped children is squarely the responsibility of one agency.* [Emphasis added].

Thus, the provisions of the IDEA delegate to the SEAs the responsibility for compliance as well as the supervisory power to implement policies and procedures to make certain that LEAs have complied with the Act. Alternatively, if the LEA is unable or unwilling to provide services in compliance with the Act, the SEA must provide services directly to such students. 20 U.S.C. § 1414(d)(1). However, when an LEA is able and willing to provide services to disabled students, the LEA is responsible for providing services directly to disabled children, primarily through IEPs. 20 U .S.C. § 1414(a)(5).

An IEP is a written statement, uniquely designed for each disabled child, that specifically describes, among other things, the special education and related services that will be provided to the child and the extent that the child will be able to participate in regular educational programs. 20 U.S.C. § 1401(20) and 34 C.F.R. §§ 300.341 – 300.350. Once a local agency develops an IEP for a child, the local agency must place the child in an educational setting according to the LRE mandate.

## B. The LRE Mandate

The LRE mandate requires SEAs to establish "procedures to ensure that, to the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled . . . ." 20 U.S.C. § 1412(5). 34 C.F.R. §§ 300.550–300.556 detail the mandate as well as the SEA's responsibility to assure compliance. Specifically, 34 C.F.R. § 300.550(a) requires that "[e]ach SEA shall ensure that each public agency establishes and implements procedures that meet the requirements of the [LRE mandate]." In placing the responsibility for the least restrictive environment squarely in the hands of the SEA, these regulations require SEAs to ensure "[t]hat special classes, separate schooling or other removal of children with disabilities from the regular educational environment occurs *only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.*" 34 C.F.R. § 300.550(b)(2) (emphasis added). The SEA, however, is not principally responsible for individually placing each child in the LRE. Instead, LEAs must ensure that each child with a disability is evaluated annually and placed in the LRE based on his or her unique needs as determined by his or her IEP. Unless a child's IEP requires an alternative placement, each child with a disability must be educated in the school that he or she would have attended had he or she not been disabled. 34 C.F.R. § 300.552.

Although SEAs are not responsible for the development and placement of each child, SEAs must take considerable steps to "ensure" that each child is afforded a placement in his or her least restrictive environment. The regulations clearly state that each SEA "shall carry out activities to ensure that teachers and administrators in all public agencies . . . are fully informed about their responsibilities for implementing [the LRE mandate] and . . . are provided with technical assistance and training necessary to assist them in this effort." 34 C.F.R. § 300.555. To ensure that the local agencies are complying with the LRE mandate, each SEA "shall carry out activities to ensure that [the LRE mandate] is implemented by each public agency." 34 C.F.R. § 300.556(a). If there is evidence that the local districts are not complying with the mandate, the SEA must

"[r]eview the local agency's justification for its actions [and] [a]ssist in planning and implementing any necessary corrective action." 34 C.F.R. § 300.556(b)(1)–(2).

While the IDEA requires each LEA to develop an IEP that incorporates the LRE mandate for each child before the beginning of each school year, the IDEA does not specify any particular process through which an IEP must be established. The CBE, however, has established a complex system of developing an IEP in accordance with Illinois law. See 105 ILCS 5/14–8.02. According to CBE's written procedure, each child's IEP is developed only after a local agency has engaged in a process that includes: detecting the characteristics of a potential disability; interviewing and testing the child either informally or through a case study evaluation that formally addresses the various components of the child's disability; and determining the presence of a disability and the eligibility for special education at a multidisciplinary staff conference. At that conference, the child's disability is determined through the categorical assessment of the child's disability characteristics. The child's placement in the LRE should be determined, however, only after the IEP is written.

Federal regulations provide that each public agency must ensure that educational placements are based on each child's IEP. 34 C.F.R. § 300.552(a)(2). Because the regulations require an individual program and placement based on each child's individual needs rather than a categorical assessment of the child's disabilities, the placement may not be made before the IEP is completed and the child's needs are determined.[6] Before 1990, however, ISBE regulations required LEAs to make IEP placement decisions at the multidisciplinary conference. In 1990, OSEP ordered Illinois to change its regulations to conform with the IDEA by disallowing any placement decisions before the end of the IEP meeting.[7] See 23 Illinois Administrative Code §§ 226.555, 226.560.

**6.** Congress first introduced the IEP in 1975. Pub.L. 94–142, 89 Stat. 776.

**7.** As stated previously, the IDEA and its regulations do not suggest a specific process to determine an IEP or an appropriate placement,

## C. Funding Formulas

As a supplementary provision under the LRE mandate, in IDEA 1997, Congress expressly prohibits states from using funding formulas that inhibit placements in the LRE: "If the State uses a funding mechanism by which the State distributes funding on the basis of the type of setting in which a child is served ... the State shall provide the Secretary an assurance that it will revise the funding mechanism as soon as feasible to ensure that such mechanism does not result in such placements." Pub.L. 105–17, 111 Stat. 61.

Before IDEA 1997, however, Congress specified the use of IDEA funds. Of the total funds that each SEA receives from OSEP under IDEA, the federal regulations designate the greater of $450,000 or five percent for administrative costs to ensure state and local compliance with IDEA (34 C.F.R. § 300.620), and up to twenty percent: (1) for direct services to children who are not receiving an adequate education; (2) for support services including personnel development, public information and parent training activities; and (3) for the SEA's monitoring activities and complaint investigations (34 C.F.R. § 300.370). Each SEA is expected to distribute the remaining seventy-five percent of the funds to the LEAs. Thus, Congress did not leave the SEAs ill-equipped to carry out their statutory duty of ensuring compliance with the Act. Instead, Congress allocated up to twenty-five percent of the state's total IDEA funds to monitor LEAs, train personnel, educate the public, provide direct services to children with disabilities and administer these functions.

## D. Procedural Safeguards

In order for an SEA to receive IDEA funds, the SEA must submit a plan to OSEP, which monitors the SEA for compliance with 20 U.S.C. §§ 1412–1413. If OSEP has reason to believe that the SEA is not complying substantially with the IDEA, OSEP must give the SEA and any agency affected by the

particularly a process that includes a multidisciplinary conference. The IDEA and its regulations do require LEAs to make placement decisions in accordance with the child's individual needs as determined by his or her IEP.

non-compliance notice and an opportunity for a hearing to explain the alleged noncompliance. 20 U.S.C. § 1416. If, after the hearing, OSEP determines that the SEA is still in substantial non-compliance, OSEP may withhold the IDEA payments to the SEA until OSEP determines that the SEA is no longer out of compliance. *Id.* If the SEA is dissatisfied with OSEP's final action, the SEA may file a request for review with the Circuit Court in which the SEA is located. *Id.*

OSEP, however, is not the IDEA's only procedural safeguard. The IDEA also requires any SEA or LEA receiving IDEA funds to establish procedures to ensure that the parents or guardians of a disabled child are notified of any decisions affecting the child's education and afforded an opportunity to contest those decisions. 20 U.S.C. § 1415; *Gadsby v. Grasmick,* 109 F.3d 940, 944 (4th Cir.1997). These procedures include: the right of parents or guardians to examine all records regarding their child's education, evaluation and placement, 20 U.S.C. § 1415(b)(1)(A); the right to obtain an independent educational evaluation of the child, *id.;* and the right to file a complaint and obtain a due process hearing with either the state or local agency, 20 U.S.C. § 1415(b)(2). After this due process hearing, the aggrieved party may appeal the decision to the state agency if the original hearing was conducted with the local agency. *See* 20 U.S.C. § 1415(c). Once a hearing occurs at the state level, the aggrieved party may file a complaint in a United States District Court, which shall "grant such relief as the court deems appropriate." *See* 20 U.S.C. § 1415(e).

**8.** Although the second amended complaint, on which this case went to trial, is worded broadly enough to include both physical and "mental" disabilities, plaintiffs' case is directed only at the latter. That is, this litigation does not focus on issues of accessability of facilities and programs for children with mobility and other strictly physical limitations.

**9.** Prior to joining the Chicago public schools in 1991, Ms. Gamm, who has a Juris Doctor degree as well as a bachelor's degree in education, was a division director of the United States Department of Education's Office of Civil Rights in Illinois.

## III. *DISCUSSION*

### A. *Failure of the Chicago Board of Education to Comply with IDEA*

As the foregoing discussion demonstrates, the IDEA and its predecessor statute were intended by Congress to address and correct institutional segregation of children with disabilities. The evidence presented at trial demonstrates beyond doubt that, despite the fact that the LRE mandate has been on the books since 1975, the Chicago public schools have languished in an atmosphere of separate and unequal education for children with emotional, mental and behavioral disabilities.[8]

■ Indeed, the City has effectively admitted as much. The court finds that the testimony of Sue Gamm, the City's Chief Specialized Services Officer,[9] to be highly credible and persuasive on the issue of the City's noncompliance with the LRE mandate of the IDEA. Ms. Gamm's testimony, along with other evidence presented by plaintiffs,[10] established the following facts:

1. Approximately 425,000 students are enrolled annually in the city's 553 schools and are instructed by some 32,000 teaching staff. Five thousand staff are dedicated to educating approximately 52,000 of these children who have disabilities, at a total cost of approximately $400 million. In addition to the public schools, the City places children with disabilities in approximately 100 non-public facilities.

2. Disabilities that qualify for special education services, such as those that are at issue in this litigation, include learning disabilities (approximately 50%), mental retardation, autism, traumatic brain disorders, behavioral disabilities, and impaired vision and hearing.

**10.** In addition to Ms. Gamm's testimony, the court bases these findings of fact on the exhibits received in evidence (including a self monitoring study conducted by the CBE in 1995–1997, evaluations conducted by the office of Civil Rights ("OCR") and the Office of Special Education Programs ("OSEP") of the U.S. Department of Education), and the testimony of the expert witnesses presented by plaintiffs, particularly that of Dr. Brian McNulty, Dr. Alice Udvari–Solner and Dr. Sharon Freagon, each of whom the court finds to be highly qualified and credible.

3. Historically, the City placed children according to the categories, or "labels," of their disabilities; that is, a child's program and educational location were determined by the type of disability the child had.[11] This is known as the "categorical system of education."

4. Despite the fact that the LRE mandate was first enacted in 1975 and became effective two years later, the City continues to place disabled children by category of disability rather than by individual needs. Thus, although federal law and administrative regulations require that children should not be removed from regular classrooms unless there is a sound educational reason, children with disabilities in Chicago continue to be segregated with other such children throughout the system in special schools for the "educable mentally handicapped" ("EMH"), "learning disabled" ("LD") and the like.[12]

5. It was not until 1992 (seventeen years after the enactment of the LRE mandate) that the city changed its policy from a categorical system of placement to one that made some attempt to educate children with disabilities in the schools they would attend if not disabled. The City began using a "resource model" in which children with disabilities would spend part of the day in a regular classroom and part in a "resource room" where their special needs would be addressed.

6. Even with this new emphasis, the CBE failed to comply with the LRE mandate due to lack of resources, inadequate training and certification of teachers, community attitudes, and (as more fully discussed below) State regulations and funding formulas that contradict the notion of educating children with disabilities in the least restrictive environment.

7. These and other failures by the City to comply with its obligations under the IDEA have resulted in a number of manifestations that were identified by Ms. Gamm and the experts who testified for plaintiffs at trial:

a. Although up to 90% of children with "mild cognitive" disabilities[13] can be served 50% or more of the time in regular classrooms, the Chicago public schools' own survey in 1997 indicated that only 15% to 22% of these children spent more than 50% of their school days in such regular classrooms.

b. IEPs typically fail to justify the segregation of children with disabilities in restrictive settings outside regular classrooms. Again, these IEPs regularly place children by the categories of their disabilities rather than by their individual educational needs and objectives.

c. Contrary to the LRE mandate and contemporary educational practices, IEPs in Chicago rarely place children with disabilities in regular classrooms with appropriate supports and adaptations.[14] This systemic failure results from poor understanding by and training of general education teachers and administrators in the meaning of LRE. Consequently, disabled children are typically "pulled out" of regular classrooms for specialized services.[15]

---

11. For example, as explained by Dr. Freagon, if a child was identified as being trainable mentally handicapped, he or she was sent to a trainable mentally handicapped center. If identified with a behavior disorder, a child went to a program for children with behavior disorders.

12. As previously mentioned and further discussed below, many of these unlawful, systemic practices were products of pre–1990 ISBE regulations as well as policies of the CBE.

13. These disabilities include labels such as "mild mentally retarded," "educable mentally retarded," and "educable mentally handicapped."

14. For example, Dr. Udvari–Solmer testified that the joint experts' investigation found no child labeled as having a moderate to severe cognitive disability being educated in a regular classroom. Conversely, the joint experts found that the only children with disabilities who were in general education were those who could "negotiate the curriculum [and] instruction with very few modifications, and the responsibility for the modification lay with the special educator [rather than with collaboration between special and general educators]."

15. Dr. Udvari–Solmer testified that, consistent with the joint experts' finding, the CBE's own data showed that only 13% of the 3355 children with mild disabilities who were educated more than 50% of the day in regular classrooms received specialized services in such classrooms. The remaining 87% were "pulled out" to receive such services.

d. Similar to the joint experts' investigations, the CBE's own self monitoring reports conducted in 95 schools for the 1995–96 and 1996–97 school years (which Dr. McNulty testified convincingly could be generalized to all 553 city schools), concluded that the city was substantially out of compliance. According to the CBE's reports, approximately one-half of the schools were out of compliance with the LRE mandate in some fashion, and two-thirds were out of compliance as measured by such factors as adequacy of IEPs, lack of collaboration between general and special educators, and inadequate knowledge by general educators of curricular modifications to adapt to the needs of children with disabilities.

e. Perhaps the most concise summary of the state of the Chicago public schools with respect to compliance with the LRE mandate can be found in OSEP's "Programs Monitoring Report" issued in February 1996 to the ISBE and the CBE. The portion concerning the CBE reads in its entirety:

> Placement data for Agency J [the CBE] showed that 90% of students identified as trainable mentally handicapped, 96% of students identified as severe/profound mentally handicapped, and 92% of students with autism, were placed in a full-time separate class, wing, annex, separate public or private day school[, or] were placed full-time in a segregated class, wing, annex, private day or residential school. Administrators explained that the agency has been working to ensure that the full continuum of placement options is considered by multidisciplinary committees when they determine the placement for all students with disabilities. They acknowledged, however, that children's disability labels have historically determined their placement, and that in many instances multidisciplinary committees continued to make categorical placement decisions. Thus, for example, separate private day placements have traditionally been the only placement options for students

with severe or profound disabilities, and most students with such disabilities continue to be placed—based on their category of disability—in such placements. The administrators confirmed that—as demonstrated by the placement data—less restrictive placement options are available from the [CBE] for students with low-incidence disabilities, but that most of these students are still placed in highly restrictive placements based on their category of disability, the "culture" (i.e., historical placement practices), and lack of space in regular education buildings. A teacher and an administrator in a junior high school informed OSEP that the assumption was that all of children identified as trainable mentally retarded would be placed in a separate categorical program once they went onto the high school level and that this was the only real option considered.

f. As discussed more fully below, statistically children with disabilities in Chicago are educated in the general classroom in far smaller percentages than the national average.

**B. *Failure of the ISBE to Comply with IDEA***

■ Despite several inadequate initiatives beginning in the early 1990s, the ISBE has failed in its responsibility to ensure that children with disabilities in Chicago are educated in the least restrictive environment. Based on the evidence presented at trial, the court finds that the following facts demonstrate the ISBE's liability in this case:

1. **Pre–1990 Regulations.** As mentioned above, prior to the 1990 ISBE regulations—contrary to the clear directives of the IDEA—Illinois regulations required the LEA to make LRE placement decisions based on the child's category of disability at the multidisciplinary conference rather than at the IEP meeting. As the OSEP report demonstrates, the legacy of this misguided and unlawful state regulation persists today.

**2. State Monitoring and Enforcement.** The testimony of Ms. Gamm and Dr. McNulty, which, as previously noted, the court finds to be credible and persuasive, established that the ISBE has failed to perform its monitoring and enforcement function as required by the IDEA and the regulations of the Department of Education.[16] As Dr. McNulty (who is in charge of enforcing the LRE mandate for the State of Colorado) explained, the state education agency must identify LRE violations by local districts *and* follow through to ensure that such violations are corrected. Although there is evidence that the ISBE, from time to time, identified failures by the CBE to comply with the LRE mandate, the evidence demonstrates that the State took few if any actions to "ensure" that these failures were corrected, and in fact consciously allowed Chicago to continue violating the mandate. In fact, according to Gail Lieberman (a current senior ISBE employee who was in charge of its Department of Special Education from 1989–1995), *the ISBE, in clear violation of its obligations under IDEA, performed no comprehensive monitoring of the City's compliance with the LRE mandate from 1989 to some time in 1994.* Perhaps the strongest proof of the ISBE's failure to perform its monitoring obligations is the pervasive, systemic and continuous failure by the CBE to comply with the LRE mandate despite consistent findings by state and federal agencies of noncompliance. As discussed previously, the IDEA makes the ISBE directly responsible for this failure by the CBE.

**3. Training.** Federal regulations require that the ISBE "shall carry out activities to ensure that teachers and administrators in all public agencies (a) [a]re fully informed about their responsibilities for implementing [the LRE mandate]; and (b) [a]re provided with technical assistance and training necessary to assist them in this effort." 34 C.F.R. § 300.555. As Dr. Freagon put it, the most important factor in ensuring that children with disabilities are educated in the least restrictive environment is "[t]hat they have teachers who are knowledgeable and have the appropriate attitude and skills." The evidence demonstrates that although the ISBE operates two programs that address training issues, these programs do not come close to meeting the ISBE's responsibility to "ensure" that teachers and administrators in Chicago are properly trained. The first such program, "Project Choices," provides "technical assistance"[17] to address the LRE needs of children with moderate to profound intellectual disabilities and multiple handicaps. Only $140,000 of Project Choices funds goes to Chicago, enough to pay for only two professionals to provide assistance to 553 schools. The ISBE does not compel non-compliant schools to accept these services; rather, they are provided (to the extent possible given the meager funding) only to those schools that request them.[18] Dr. Freagon, Dr. McNulty and Ms. Gamm all testified—and the court agrees—that Project Choices is totally inadequate to provide necessary training in LRE to the CBE's teachers and administrators.

These witnesses also established that the other ISBE training program, the "Regular Education Initiative" ("REI"), is similarly inadequate. Under REI, the ISBE trains individuals in specific schools on LRE issues. Again, the program is far too small to make a difference in Chicago.

16. With regard to monitoring activities, 34 C.F.R. § 300.556 provides:

"(a) The SEA shall carry out activities to ensure that [the LRE mandate] is implemented by each public agency.

(b) If there is evidence that a public agency makes placements that are inconsistent with [the LRE mandate], the SEA shall—

(1) Review the public agency's justification for its actions; and

(2) Assist in planning and implementing any necessary corrective action."

17. Technical assistance in this context means the provision of expert personnel to local districts to identify and work on LRE issues.

18. This would appear to be a clear, discreet violation of 34 C.F.R. § 300.355(b), which requires the ISBE to "carry out activities to ensure that teachers and administrators in *all* public agencies ... are provided with technical assistance and training...." (Emphasis added).

Consequently, CBE teachers continue to be trained in disability categories to work in specific kinds of settings such as a resource room or other segregated setting, rather than regular classrooms, as expected by the LRE mandate. It is important to remember that through that mandate, the IDEA requires that children with disabilities be educated in the regular classroom unless there are sound, articulated educational reasons not to do so, and only then to the extent appropriate for each child. Unfortunately, the evidence at trial clearly establishes that Chicago teachers and administrators have not been trained in the basic principles of LRE, and continue to stand the mandate on its head by presuming that children with disabilities should be educated in segregated settings according to the categories of their disabilities.[19]

4. **Teacher Certification.** Although the categorical system of educating children with disabilities, which was historically implemented in Chicago and Illinois, is contrary to the LRE mandate, the ISBE continues to certify teachers [20] by categorical labels associated with particular disabilities. Because teachers are trained and certified to teach by category of disability, they are unable to service disabled children in the integrated settings presumed by the LRE mandate. Consequently, antiquated certification categories have combined with inadequate training and teacher education in Illinois (geared to the certification categories) impermissibly to perpetuate categorical segregation of children with disabilities. While plaintiffs' experts offered their solutions to remedy this violation by the State, the court, as discussed in the remedies section below, believes that it is in keeping with Congressional intent to direct the ISBE to offer modifications in the words of the regulations, "to carry out activities") to ensure that teacher certification in Illinois complies with rather than contradicts the LRE mandate.

5. **Funding formulas.** As the ISBE acknowledges, the program by which it reimburses the CBE for educating children with disabilities creates a financial incentive to take these children out of the public school system and place them in private, segregated schools. As the ISBE points out, in IDEA 1997, Congress specifically required that state funding formulas not be dependent on the type of educational setting,[21] thus requiring the ISBE to alter its current practice. While this new statutory mandate—assuming (perhaps naively) the ISBE's compliance with it—might influence the appropriate remedy in this case, it does not affect the necessary conclusion that the ISBE's current funding formula totally contradicts the LRE mandate by perpetuating segregated education of children with disabilities.

6. **Continuing denial of responsibility.** Perhaps most disturbing, the ISBE continues to this day to deny the seriousness of the CBE's noncompliance with the LRE mandate, and continues to deny its own clear statutory obligations to ensure compliance by the City. Instead, the State has chosen to assume the role of a victim of overzealous litigation seeking to make it "strictly liable" for minor failures by the CBE. To the contrary, the ISBE is not the "victim"; it is, by virtue of having accepted federal educational funds, the statutorily designated responsible agency for "ensuring" compliance by all districts in the state with the LRE mandate. Neither the named defendant, Joseph Spagnolo, Illinois Superintendent of Education, nor any member of the Illinois State Board of Edu-

---

19. The court does not intend by this opinion to label all teachers and all schools as inadequately trained or unmindful of their obligations under the LRE mandate. The witnesses and the data presented at trial indicate some areas of compliance and progress. Those same witnesses and data, however, also establish that on a systematic basis, training in LRE issues has been practically nonexistent.

20. Although teacher certification in Illinois is governed by the State Teacher Certification

Board ("STCB"), by statute the ISBE controls the appointments of all STCB board members as well as its finances and rules. 105 ILCS 5/21–13. Moreover, Ms. Lieberman testified that the ISBE's recommendations to the STCB regarding teacher certification are generally followed. Finally, the IDEA places responsibility for compliance by all agencies with the LRE mandate on the ISBE. 34 C.F.R. § 300.550.

21. Pub.L. 105–17, 111 Stat. 61.

cation testified at trial to explain the reasoning behind the ISBE's neglect of the duties imposed on it by the IDEA. Perhaps the seemingly casual attitude taken by the State with respect to educating children with disabilities in the least restrictive environment explains the specific failures of the ISBE detailed above.

7. **Unfavorable statistical comparisons.** The ISBE's failure to fulfill its responsibilities to ensure that children with disabilities are educated in the least restrictive environment is reflected in the statistical comparison of Illinois to national averages. In a ranking in descending order of the 50 states comparing the total percentages of students ages 6 to 21, Illinois ranked at or near the bottom in every category: any disability, educated in a regular or resource setting, 47/50; any disability, educated in separate classrooms, 47/50; any disability, educated in separate facilities, 47/50; cognitive or multiple disabilities, educated in a regular or resource setting, 50/50.[22] The performance of the Chicago public schools in these categories, as measured by data supplied by the City, was even worse than the State's.

## C. *The ISBE's Defenses*

The ISBE raises various defenses against plaintiffs' charges to support its position that it should not be held responsible for the Chicago public school system's pervasive and systematic failure to comply with the LRE mandate. With certain exceptions, these defenses are without merit.

### Defense #1—"Standard of Perfection" and Limited Responsibility

As mentioned above, the ISBE contends that plaintiffs are holding it to a standard of perfection by making it responsible for the "correctness of each IEP and the appropriateness of each placement." Instead of "becoming the guarantor of the day-to-day actions of all its local schools," the ISBE maintains that it is responsible only for "oversight and general supervision" by making sure that the Chicago public schools have special education regulations, proce-

dures and monitoring requirements that comply with the LRE guidelines. To further support this theory of limited responsibility, the ISBE explains that it is unreasonable to hold it to a standard of perfection because federal and state laws fail to provide adequate funding and tools to conduct the supervision, training, and monitoring necessary to "micro-manage" all of the schools in Illinois.

Plaintiffs, on the other hand, repeatedly explain that they do not seek to hold the ISBE responsible for each child's IEP and placement. Instead, plaintiffs maintain that the ISBE is "the ultimate guarantor of the LRE mandate" and thereby "required to intervene in order to remedy a local school district's systematic and pervasive failure to provide an adequate opportunity for students with disabilities to be educated in the LRE."

After extensively reviewing the trial record, the statute and the pertinent case law, the court finds that the ISBE has repeatedly failed to make the necessary distinction between micro-managing every child's placement and ensuring that the CBE has sufficient guidelines and resources to systematically place children with disabilities in the least restrictive environment. By referring to bits and pieces of the statute and regulations, the ISBE repeatedly, and incorrectly, maintains that its responsibility is limited to providing "general supervision" to the local school districts so that it need not follow through to ensure that the necessary procedures have been implemented and the remedies have corrected past violations. Significantly, the ISBE fails to cite to *any* case law to support this theory of limited responsibility. This is quite understandable, since no such case law exists.

In fact, the courts have consistently found against state agencies—including the ISBE—that have attempted to deny responsibility for the systematic failure of local school districts to provide necessary educational services. In *Gomez v. ISBE*, 811 F.2d 1030, 1043 (7th Cir.1987), the ISBE tried to place all of the responsibility on the

---

**22.** Dr. McNulty, one of the joint expert witnesses, calculated these statistics using OSEP statistical    data from each of the fifty states.

local school districts for their failure to comply with the provisions of the Equal Education Opportunity Act ("EEOA"). When challenged for failing to promulgate, monitor and enforce uniform and consistent guidelines for the identification, placement, and training of students with limited English skills, the ISBE argued that it was not empowered to supervise and enforce local compliance with the EEOA. *Id.* at 1042. The Seventh Circuit, however, interpreted the EEOA to require states to issue uniform guidelines as well as monitoring and enforcement schemes consistent with EEOA regulations. *Id.* Thus, despite the fact that the language of the EEOA was fairly generalized, only requiring an educational agency "to take appropriate action," and lacking legislative history to specify its intent, the Seventh Circuit found the ISBE responsible for promulgating, monitoring and enforcing guidelines consistent with the EEOA. The instant case is even less favorable to the ISBE than was *Gomez* because the IDEA, its regulations and its legislative history, explicitly provides that the State is responsible to assure compliance by local districts with the LRE mandate.

In a more recent case, this time under Part H of the IDEA, the ISBE tried to limit its responsibility to implement a statewide system of early intervention services to infants with disabilities by claiming, among other things, that the statute is too vague to be enforced by individuals in an action under 42 U.S.C. § 1983. Rejecting the ISBE's argument, the Seventh Circuit found that the statute unambiguously used language such as "all," "shall," and "must" to indicate that the state's obligation to provide services is "mandatory, not precatory." *Marie O. v. Edgar*, 131 F.3d 610, 620 (7th Cir.1997). In a similar fashion in the context of the instant case, the statutory language of Part B of the IDEA, by repeatedly using the word "ensure," unambiguously requires the state "to make certain"[23] that the IDEA's statutory requirements are carried out by local school districts.

Many other circuits have analyzed Part B of the IDEA and arrived at this conclusion.

In *Kruelle v. New Castle County School Dist.*, 642 F.2d 687 (3rd Cir.1981), the court found the Delaware Board of Education responsible for failing to ensure an individual child's proper evaluation and appropriate placement as determined by the IDEA. With a "perfection" defense remarkably similar to that of the ISBE in the instant case, the state suggested that the plaintiffs were asking it to "engage in the detailed development of a specific educational program for [the child]." By referring to the IDEA's legislative history, the court noted that "the state, in contending that it functions solely as a supervisory agency and should not be responsible for coordinating efforts to develop an IEP for [the child] or to insure funding," distorted the meaning of the statute and the regulations. *Id.* at 697. Referring to 20 U.S.C. §§ 1412(5)–(6), the court concluded that the "[r]esolution of any interagency conflicts or delegation of duties from state to regional and local levels [is] left, as it should [be], in the hands of the state officials." *Id.*

Thus, the Third Circuit in *Kruelle* held the state directly responsible for "insuring" and funding one child's appropriate evaluation and placement. According to this precedent, the ISBE is liable for the "correctness of each IEP and the appropriateness of each placement"—responsibilities the ISBE denigrates as "micro-management." Plaintiffs, however, do not seek to hold the State to this standard. Instead, they seek only to hold the ISBE responsible for the CBE's systematic and pervasive failure to comply with the LRE mandate. Although plaintiffs—perhaps realistically in this class action setting—have lowered their sights, the ISBE's position on this point (in the instant case as in *Marie O.*) demonstrates its fundamental misunderstanding of its responsibilities under the IDEA.

Other courts have found that the state educational agency is responsible for a local school district's systematic failure to comply with an IDEA mandate. In *Cordero v. Pennsylvania Dept. of Educ.*, 795 F.Supp. 1352, 1362 (M.D.Pa.1992), the court held the

---

**23.** This is the dictionary definition of "ensure." *Webster's II New Riverside University Dictionary*    434 (1994).

state responsible for, among other things, the local system's failure to secure appropriate education for children with disabilities in a timely manner. The court traced the roots of this failure to "the design of the system itself." *Id.* at 1362. With an argument that has become all to familiar, the state argued that its responsibility under the IDEA is limited to providing funds, promulgating regulations, reviewing individual complaints, and providing direction and training to local school districts. The state maintained that the local school districts, on the other hand, "are empowered to use available funds in creative ways to ensure that handicapped students are receiving an appropriate education." The court rejected this argument, stating, "[t]he IDEA places the responsibility for the development and implementation of policies and procedures to guarantee disabled children a free appropriate education on the states." *Id.* at 1356 (citing 20 U.S.C. § 1412(1)–(2)).

Thus, in *Cordero,* the state acknowledged its obligation to provide funds and training—perhaps more than the ISBE acknowledges—but, like the ISBE, it denied its statutorily mandated duty to "ensure" compliance with the dictates of the IDEA. The *Cordero* court, like all of the other courts that have addressed similar issues, rejected the state's argument and confirmed the state's responsibility to "ensure" compliance with the IDEA. *See also, Jose P. v. Ambach,* 669 F.2d 865, 870–71 (2d Cir.1982) (explaining that even though the state's obligation under New York law is limited to supervising local school districts that provide educational opportunities directly to children with disabilities, the State Commissioner was nonetheless responsible for the local district's failure to enforce federal and state laws because he must "ensure compliance with [his] orders"); and *Ramon v. ISBE,* No. 91 C 6794, 1992 WL 186248 (N.D.Ill. July, 30, 1992) (finding that the ISBE is ultimately responsible for a local school district's failure to provide surrogate parents to children with disabilities who are wards of the state despite the fact that the ISBE's procedures place the initial responsibility for this service directly in the hands of the local school districts).

Interestingly, while avoiding this plethora of case law and selectively referring to certain sections of the IDEA, the ISBE nonetheless effectively concedes that it is responsible to ensure compliance with the IDEA when it states that the ISBE must "make sure that the public agency, here the Chicago Public Schools, has and uses procedures as to least restrictive environment requirements and it is the State's responsibility to monitor Chicago periodically to ensure that it is complying with its responsibilities." In the same paragraph, however, the ISBE attempts to refute the meaning of this unavoidable conclusion by stating "that it is clearly up to the local school district to ensure evaluation, placement and the actual delivery of services in accordance with the law." It appears that the ISBE confuses "ensuring" systematic compliance (the ISBE's responsibility) with making individual placement decisions (primarily the local school district's responsibility). While local school districts perform the IEP evaluations and determine individual placement decisions, the statutes and case law make it abundantly clear that the ISBE is responsible for ensuring that the local school districts' evaluations and placements systematically comply with the provisions of IDEA and the LRE mandate.

Further, IDEA funding provisions adequately provide for the ISBE to carry out its responsibilities. The ISBE incorrectly suggests that only 5% of its federal IDEA allotment may be used by the state to monitor and enforce IDEA's provisions. As discussed previously, the regulations specify that the ISBE may use up to 5% of its federal allotment to support its *direct administrative costs,* but in addition, the ISBE may allocate up to 20% of IDEA funds for purposes such as compliance monitoring, implementing a comprehensive system of personnel development, and public information and parent training. *See* 34 C.F.R. §§ 300.370 and 300.706. The ISBE's failure to understand these regulations is inexplicable.

As noted above, the ISBE is also mistaken when it claims that its means of enforcing IDEA is limited to withholding funds to

school districts that fail to comply with the LRE mandate. In addition to the regulations that describe potential ways the ISBE can directly use 20% of its total IDEA allotment, the Illinois School Code describes the tools the ISBE has available to ensure each child with a disability is educated in the LRE. These tools include counseling and providing technical assistance to teachers. *See* 105 ILCS 5/2–3.3 – 5/2–3.25f. Further, it is in the ISBE's best interest to ensure compliance with means other than that of withholding funds. When the ISBE elects to withhold IDEA funds from a local school district, the ISBE is responsible for providing special education and related services directly to children with disabilities in that district. 20 U.S.C. § 1414(d)(1).

Thus, contrary to the ISBE's position in this litigation, once the ISBE accepts federal IDEA funds it becomes responsible for following through and ensuring that the local school districts effectively educate children with disabilities in the least restrictive environment.

## Defense # 2—ISBE's Monitoring Efforts

The ISBE contends that its monitoring system does not violate the IDEA because: (1) the IDEA fails to provide any guidance as to how the ISBE should monitor for LRE compliance; (2) the ISBE's monitoring plan is adequate.

■ The ISBE's argument implies that all monitoring efforts, no matter how inadequate, comply with the IDEA because the IDEA does not provide any monitoring guidelines. This argument is obviously wrong. While it is true that IDEA and its regulations do not provide specific guidance as to how an SEA should monitor for LRE compliance, the IDEA nonetheless requires the ISBE to ensure LRE compliance through an effective monitoring plan. Thus, one must look to the results of the ISBE's monitoring efforts to determine whether the ISBE is in compliance with the IDEA.

Instead of looking to the results, however, the ISBE defends its monitoring efforts by briefly describing its monitoring plan and omitting any evidence of the effectiveness of the plan. Thus, while the ISBE did submit its monitoring manual into evidence, it presented no evidence at the trial regarding the results of its LRE compliance monitoring efforts. In fact, the two ISBE employees who could have presented some testimony on this subject—Jack Shook and Gail Lieberman—provided no testimony regarding LRE compliance in Chicago. Jack Shook is the Division Administrator for the ISBE's Division of Program Compliance. He observed the first three days of the four-day trial as the ISBE's designated representative and was identified by the ISBE to testify on the last day of the trial. On that day, however, he did not appear in the courtroom and the ISBE did not mention his absence. Gail Lieberman, the former assistant superintendent for the Department of Special Education, testified at the trial but did not discuss LRE compliance in Chicago. The fact that neither of these witness testified to defend their compliance program is significant because plaintiffs provided overwhelming evidence through Ms. Gamm and the expert witnesses that the ISBE's LRE efforts were wholly inadequate. The ISBE fails even to attempt to refute this evidence.

■ The expert witnesses testified that while the ISBE's monitoring plan appeared adequate on paper, the results of the efforts indicated that the ISBE's monitoring of the CBE is inadequate to ensure compliance. Specifically, the experts reviewed the ISBE's rules and regulations, its state plan, its monitoring documents, and its monitoring reports and found that the ISBE does not follow through with its monitoring efforts to ensure that compliance violations are rectified. Thus, while the ISBE may correctly identify some LRE violations, it does not direct the school district to take any effective corrective action. As the *Cordero* court put it, the ISBE has "publish[ed] some procedures and then wait[ed] for the phone to ring." 795 F.Supp. at 1362. This clearly violates the ISBE's responsibility under IDEA to "ensure" LRE compliance by the local district.

## Defense # 3 Deference to OSEP

Despite the fact that the ISBE's monitoring efforts do not ensure compliance with the IDEA, the ISBE not only continues to maintain that its monitoring efforts are adequate but also argues that plaintiffs are "second-guessing" its actions and those of OSEP by

requiring the ISBE to ensure compliance through its monitoring efforts. The ISBE argues:

> Thus, plaintiffs ask this court to make the determination that ISBE monitoring is inadequate, and to, in essence, second-guess the ISBE's actions. And, in second-guessing the ISBE in this regard, they also ask the court to ignore the responsibility vested by Congress in OSEP to administer Part B of IDEA and to review ISBE's actions, to approve ISBE's monitoring plans and other aspects of its State plan. Any changes in ISBE monitoring policies and practices should be left to that oversight agency, in absence of specific statutory requirements to provide judicial guidance.

■ While the ISBE is correct that OSEP must approve the ISBE's plan for compliance with the IDEA, the ISBE is incorrect when it asserts that the court should conclude that the ISBE is in compliance with the IDEA simply because OSEP approved the ISBE's plan. Contrary to the ISBE's above-quoted statement, the IDEA includes statutory provisions that require the court to review, in certain circumstances, the ISBE's actions and devise an appropriate remedy if it finds a violation. In addition to this procedural safeguard within the IDEA, the IDEA authorizes parents and guardians of handicapped children to use other statutes, as vehicles to enforce rights of children with disabilities.[24] Given the fact that the ISBE was incorrect when it proffered this "leave-it-to-OSEP" argument, as the statute and the case law make abundantly clear, it is not surprising that the ISBE has failed to cite any statutory authority or precedent to support its argument.

In maintaining that the court should defer any judgment regarding its monitoring efforts to OSEP, the ISBE ignores the procedural safeguard in the IDEA specifically created to ensure, among other things, that parents and guardians have the opportunity to present complaints regarding their child's free appropriate education in federal court. The IDEA specifically provides a private right of action whereby an aggrieved parent or guardian may file a complaint in a United States district court after participating in an impartial due process hearing at the local and/or state level. To ensure the child's right to a free appropriate education, the court is authorized to "grant such relief as the court deems appropriate." 20 U.S.C. § 1415(e) Because adequate monitoring on the part of the state is imperative to ensure a free appropriate education, the court must review the state's monitoring policies when a parent or guardian files a complaint regarding these monitoring policies.

In addition to ignoring 20 U.S.C. § 1415(e), the ISBE also ignores 20 U.S.C. § 1415(f), which specifically authorizes parents and guardians to use other federal statutes as vehicles to enforce the requirements of the IDEA. *See* 20 U.S.C. § 1415(f). In *Marie O. v. Edgar*, 131 F.3d 610, 615 (7th Cir.1997), the Seventh Circuit explains the history behind section 1415(f):

> Section 1415(f) was enacted in response to the Supreme Court's decision in *Smith v. Robinson*, 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984). *Smith* had held that the EHA was the exclusive avenue through which to assert a claim. The EHA's extensive administrative scheme, the Court had held, foreclosed a section 1983 or similar action. Congress responded by enacting section 1415(f) which al-

---

24. 20 U.S.C. § 1415(f). In accordance with this provision, plaintiffs have included within their IDEA counts claims under Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 504, the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq., and 42 U.S.C. § 1983, alleging violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The parties agree that the court should not apply a separate analysis under Section 504 or the Rehabilitation Act because the least restrictive environment requirements in Section 504 and the ADA are substantially similar to the provisions found in the IDEA. There is some precedent for this. *D.F. v. Western School Corporation*, 921 F.Supp. 559, 574 (S.D.Ind., 1996). Accordingly, the court is not analyzing this case under either Section 504 or the ADA. The parties have also stated that the court should not apply a separate analysis under the Equal Protection Clause, but provide no reasoning for this argument. Because the court finds that the analysis under the IDEA provides plaintiff with sufficient relief, and the parties have provided no analysis under the Equal Protection Clause, the court regards such claims as waived.

lowed "children and youth with disabilities" to bring section 1983 claims under the EHA.

Thus, although the IDEA provides extensive procedural safeguards within the statute, Congress concluded that such safeguards may not always enforce the requirements of the IDEA. As a result, Congress granted parents a private right of action. The very fact that Congress enacted this provision can be used to refute the ISBE's argument that OSEP should be the exclusive avenue of enforcement.

Given these two statutory provisions within the IDEA that completely refute the ISBE's argument, the court cannot understand how the ISBE could attempt to argue otherwise.

### Defense # 4—Teacher–Student Ratios

ISBE regulations establish teacher-student ratios for special education that plaintiffs contend strongly discourage educating children with disabilities in the least restrictive environment. These regulations (Ill.Admin.Code 23 § 226.225 (1997)) prescribe ratios based on the placement of the child rather than on the individual needs of the children in the particular setting. Thus, for example, in a resource room the regulations require a maximum ratio of one teacher to 20 children, while in a self-contained setting for children with learning disabilities the ratio is one teacher to ten children. Because the ISBE requires that the lowest ratio associated with any child assigned to a particular special education teacher be applied to that teacher's entire caseload, the movement of a single child from a self-contained setting to a less restrictive setting for even part of the day requires either an extra teacher or a drastic reduction in the size of the class. As a result, plaintiffs claim that the type of integrated curriculum contemplated by the LRE mandate, in which children may spend part of the day in a self-contained setting and part in a regular or resource classroom, is discouraged. Although the teacher-student

ratios established by the ISBE may contribute to the CBE's non-compliance with the LRE mandate, the court is not convinced that this facet of State regulation violates its obligations under IDEA. In determining appropriate maximum class sizes in particular settings, the ISBE's judgment must be accorded due deference, absent a showing that such judgment violates federal law. The record in this case does not support such a showing.

### Defense # 5—Public Leadership

Plaintiffs point to the ISBE's lack of leadership, including its refusal to adopt a policy statement supporting "inclusion,"[25] not as discreet violations of the IDEA, but as evidence of the ISBE's indifference and lack of commitment to the LRE mandate. In order to correct historically persistent negative attitudes toward disabled people in general, and children in particular, the ISBE, according to plaintiffs, must take a leadership position. Instead, as indicated by deposition testimony[26] of Superintendent Spagnolo and Gail Lieberman, after much public and internal debate, the ISBE decided to eschew a leadership role in enforcing the LRE mandate. In his deposition, Mr. Spagnolo stated his (mistaken) belief that it was not the ISBE's role to instruct local districts not to remove children with disabilities from the regular classroom unless the child's needs could not be met in that setting (i.e., the LRE mandate). In her deposition, Ms. Lieberman, a senior ISBE employee who advocated the adoption of a policy statement on inclusion, offered disturbing testimony that she observed ISBE board members' personal discomfort at being around people with disabilities.

The ISBE defends its decision not to issue a policy statement on inclusion on the grounds that, (1) inclusion is a broader concept than the LRE mandate, and (2) because LRE is the law there need be no policy statement. While each of these points,

---

**25.** According to plaintiffs' expert witnesses, the term "inclusion" is broader than the concept of least restrictive environment. "Inclusion" is generally understood to describe the concept of including all disabled children in regular classrooms by providing appropriate aids and adaptations in the context of such classrooms.

**26.** The court overrules the ISBE's objections to the admission of these deposition transcripts. The excerpts offered by plaintiffs are clearly relevant to the issues in this case, and plaintiffs are entitled to use them for any purpose pursuant to Fed.R.Civ.P. 32(a)(2).

viewed in isolation, is correct, in the context of the record in this case, which establishes a deliberate indifference by the ISBE to its obligations to ensure compliance with the LRE mandate, the arguments are less persuasive. The court is reluctant to attempt to compel a change of subjective attitude by the individual members of the ISBE, and agrees with plaintiffs that the ISBE's failure of leadership is not a distinct violation of the IDEA. Thus, although the ISBE's rather public refusal to adopt the proposed policy statement on inclusion improperly sent a negative message that, consistent with Mr. Spagnolo's misconception of the State's role, the ISBE did not support the concept of educating children with disabilities in the least restrictive environment, the ISBE cannot be held liable for this episode.

### D. *Remedies*

The court hereby holds and declares that the ISBE is in violation of the IDEA because the ISBE has failed and continues to fail to ensure that:

(1) placement decisions are based on the child's individual needs as determined by his or her IEP;

(2) LRE violations are identified and corrected;

(3) teachers and administrators are fully informed about their responsibilities for implementing the LRE mandate and are provided with the technical assistance and training necessary to implement the mandate;

(4) teacher certification standards comply with the LRE mandate; and

(5) state funding formulas that reimburse local agencies for educating children in the least restrictive environment are consistent with the LRE mandate.

In addition to the declaratory relief stated above, the court permanently enjoins the ISBE from further violations of the IDEA, and directs the following corrective actions.

Mindful that the ISBE cannot realistically be expected to remedy its past deficiencies overnight, and that the most effective compliance should be designed, in the first instance at least, by the ISBE, the court directs the ISBE to submit a comprehensive compliance plan to the court on or before April 17, 1998. The plan should address:

(a) the correction of each of the violations mentioned above;

(b) whether compliance can be achieved by joining or augmenting the program being implemented in connection with the settlement between plaintiffs and the CBE; and

(c) whether a monitor is needed, and, if so, the role of the monitor.

The court directs plaintiffs to file a response to the ISBE's plan on or before May 1, 1998. The court will hold a status meeting on May 8, 1998 at 11:00 a.m. with respect to the compliance plan. Because the court informed the parties on December 29, 1997 that it had decided to rule against the ISBE and because of the comprehensive remedial plan in effect with respect to the CBE, no continuances will be granted.

It is of the utmost importance to begin a compliance program before the beginning of the school year 1998–1999, to minimize the harm to children with disabilities who attend public schools in Chicago. As the Supreme Court ordered in connection with racial integration,[27] the State should act "with all deliberate speed" to correct the segregation that afflicts disabled children in Chicago.

27. *Brown v. Board of Education*, 349 U.S. 294, 301, 75 S.Ct. 753, 757, 99 L.Ed. 1083 (1955).